UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒

JENNY MARIE PLAZA,

                          Plaintiff,

        -against-

COMMISSIONER OF SOCIAL SECURITY,[1]

                          Defendant.

19cv3853 (DF)

**MEMORANDUM
AND ORDER**

**DEBRA FREEMAN, United States Magistrate Judge:**

       In this Social Security action, which is before this Court on consent pursuant to 28 U.S.C.

§ 636(c), plaintiff Jenny Marie Plaza ("Plaintiff") seeks review of the final decision of defendant

Commissioner of Social Security ("Defendant" or the Commissioner"), denying Plaintiff Social

Security Disability Insurance ("SSDI") benefits under Title II of the Social Security Act (the

"Act"), on the ground that, for the relevant period, Plaintiff's impairments did not constitute a

disability under the Act.  Currently before the Court is Plaintiff's motion, made pursuant to Rule

12(c) of the Federal Rules of Civil Procedure, for judgment on the pleadings reversing the

Commissioner's decision, or, in the alternative, remanding for further proceedings.  (Dkt. 19.)

Also before the Court is Defendant's cross-motion, made pursuant to Rule 12(c) of the Federal

Rules of Civil Procedure, for judgment on the pleadings affirming the Commissioner's decision.

(Dkt. 21.)  For the reasons set forth below, Plaintiff's motion (Dkt. 19) is granted to the extent it

seeks remand for further administrative proceedings.  Defendant's cross-motion (Dkt. 21) is

denied.

---

       [1]  The Court notes that Andrew M. Saul has been appointed Commissioner of the Social
Security Administration ("SSA").

## BACKGROUND[2]

Plaintiff filed an application for SSDI benefits on June 17, 2016,[3] alleging that she became disabled as of January 4, 2016, as a result of her conditions of insomnia, sciatica, pain, anxiety disorder, depression, and asthma.  (R. at 133-34, 147-50.)  After her claim was initially denied on July 21, 2016, Plaintiff requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 77-78.)  On February 6, 2018, Plaintiff, represented by counsel, testified at a hearing held before ALJ Brian G. Kanner (the "Hearing").  (*Id*. at 27-59.)  No vocational expert was called to give testimony at the Hearing.

In a decision issued on July 11, 2018 (*id.* at 11-21), ALJ Kanner found that, although Plaintiff suffered from the severe impairments of degenerative disc disease[4] and depressive disorder[5] (*id*. at 14), Plaintiff's impairments did not meet or equal the criteria of any impairment

---

[2] The background facts set forth herein are taken from the SSA Administrative Record (Dkt. 18) (referred to herein as "R." or the "Record").

[3] The parties appear to disagree as to when Plaintiff filed her SSDI benefits application.  (*Compare* Memorandum of Law in Support of the Plaintiff's Motion for Judgment on the Pleadings ("Pl. Mem.") (Dkt. 20), at 1 (stating that June 27, 2016 was the application filing date), *with* Memorandum of Law in Opposition to Plaintiff's Motion for Judgment on the Pleadings and in Support of the Commissioner's Cross-Motion for Judgment on the Pleadings ("Def. Mem.") (Dkt. 22), at 1 (stating that June 16, 2016 was the filing date).)  Neither party appears to be correct, as the Record indicates that the application was filed on June 17, 2016.  (R. at 133-34.)  Regardless of this exact filing date, the parties nonetheless agree that the relevant period for determining whether Plaintiff is entitled to SSDI benefits began to run on January 4, 2016, the alleged onset date of her disability.  (*See* Pl. Mem., at 1; Def. Mem., at 1.)

[4] "The term 'degenerative disc disease' describes disc degeneration that causes pain and other symptoms[; in particular d]egenerative disc disease can cause pain, weakness[,] or numbness.  Exact symptoms vary depending on the location and type of disc degeneration. However, the primary symptoms of degenerative disc disease include sharp and/or chronic pain in the back and neck."  *Degenerative Disc Disease*, THE SPINE HOSPITAL AT THE NEUROLOGICAL INSTITUTE OF NEW YORK, https://www.columbiaspine.org/condition/degenerative-disc-disease/ (accessed Sept. 28, 2020).

[5] "Depression is a mood disorder that causes a persistent feeling of sadness and loss of interest.  Also called major depressive disorder or clinical depression, it affects how you feel,

listed as disabling in the relevant regulations (*id*. at 14-15).  The ALJ further found that Plaintiff

had the residual functional capacity ("RFC") to perform a full range of light work with certain

limitations, and, therefore, was not disabled under the Act.  (*Id*. at 15, 20).  Following the ALJ's

decision, Plaintiff, no longer represented by counsel (*see id.* at 6-7 (notice of counsel's

withdrawal)), sought to appeal to the Appeals Council, submitting reasons why she disagreed

with the ALJ's decision (*id.* at 129-32).  On March 5, 2019, the Appeals Council denied

Plaintiff's request for review, finding that her reasons for seeking review did not provide a basis

for changing the ALJ's decision.  (*Id*. at 1-5.)  Thereafter, the ALJ's decision became the final

decision of the Commissioner.

Now, through new counsel, Plaintiff challenges the Commissioner's denial of SSDI

benefits, before the Court.

A.    **Plaintiff's Personal and Employment History**

In her application for SSDI benefits, Plaintiff stated that she was born on May 23, 1968,

thus making her 47 years old as of her alleged disability onset date of January 4, 2016.  (*Id.* at

144.)  Plaintiff reported that she had never been married (*id.* at 134), and, at the Hearing, she

stated that she had two sons – one who was then 27 years old and lived on his own, and another

who was then 12 years old and lived with Plaintiff in a second-floor apartment (*id.* at 56-57).

Plaintiff testified that she had an 11th-grade education.  (*Id.* at 38.)

According to the form "Disability Report" that she submitted, Plaintiff worked as a

teaching assistant from February 1996 through June 2008, and then as a retail associate at Kmart

---

think and behave and can lead to a variety of emotional and physical problems.  You may have
trouble doing normal day-to-day activities, and sometimes you may feel as if life isn't worth
living."  *Depression (major depressive disorder)*, MAYO CLINIC,
https://www.mayoclinic.org/diseases-conditions/depression/symptoms-causes/syc-20356007
(accessed Sept. 28, 2020).

from March 2011 until July 2016.  (*Id.* at 148.)  Plaintiff testified that she had not performed any

work since July 24, 2016.  (*Id.* at 38.)

### B.   Medical Evidence

As Plaintiff reported that her disability began on January 4, 2016, the relevant period

under review for purposes of her application for SSDI benefits runs from that date until

December 31, 2020, the date when Plaintiff is last insured.  *See* 42 U.S.C. §§ 423(a)(1), (c)(1);

20 C.F.R. §§ 404.130, 404.315(a); *Arnone v. Bowen*, 882 F.2d 34, 37 (2d Cir. 1989).[6]

### 1.   Hospital Records From the Alleged Onset Date of Plaintiff's Disability

The Record contains documentation from the Union Community Health Center

("UCHC") Emergency Department relating to Plaintiff's visit to the hospital on January 4, 2016,

the date of the alleged onset of her disability.  (*Id.* at 215-19.)  On that date, Plaintiff reported

experiencing lower back pain on her left side, which radiated down her left thigh to her left calf

muscle.  (*Id.* at 216.)  Plaintiff had no other complaints of pain and denied feeling numbness,

tingling, or weakness.  (*Id.* at 216-17.)  On examination by a doctor of osteopathic medicine,

Dr. Paul Beyer, it was recorded that Plaintiff had full muscle strength and was able to ambulate

with a steady gait; yet, it was also noted that she exhibited back-side and left-side paralumbar

tenderness.  (*Id.* at 218.)  Dr. Beyer assessed Plaintiff's symptoms as "possibly due to sciatica."

(*Id.* at 218; *see id.* at 215 (also recording that Plaintiff had a urinary tract infection).)  Plaintiff

---

[6] To be eligible for SSDI benefits, "an applicant must be 'insured for disability insurance
benefits.'"  *Arnone*, 882 F.2d at 37 (quoting 42 U.S.C. §§ 423(a)(1)(A), 423(c)(1)).  "An
applicant's 'insured status' is generally dependent upon a ratio of accumulated 'quarters of
coverage,'" *i.e.*, quarters in which the applicant earned wages and paid taxes, "to total quarters."
*Id.* (citations omitted).  To qualify for SSDI benefits, "Plaintiff's disability onset date must fall
prior to [her] date last insured."  *Camacho v. Astrue*, No. 08-CV-6425, 2010 WL 114539, at *2
(W.D.N.Y. Jan. 7, 2010) (citing *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008)); 20 C.F.R.
§ 404.315(a).

was discharged that same day with a prescription for Methocarbamol,[7] Ibuprofen, and

Ciprofloxacin.[8]  (*Id.* at 215-16.)

## 2.   Plaintiff's Treatment Records During the Relevant Period

The Record reflects that, during the relevant period, Plaintiff received treatment from a

primary care physician, Dr. Brian Delaney (*id.* at 225-28, 243-45, 248-58, 329-30, 344-67), and

two pain management specialists, Dr. Ajay Suman (*id.* at 278-80, 283-84) and

Dr. Lorenza Freddo (*id.* at 327, 383-85).  Plaintiff also underwent a psychosocial assessment by

Shirley Rodriguez, LCSW-R[9] (*id.* at 368-72), received mental-health treatment from a

psychiatrist, Dr. Tahir Khan (*id.* at 375-381), and received emergency medical care at

St. Barnabas Hospital (*id.* at 386-92).  The Court will summarize these providers' treatment

notes, in turn.[10]

---

[7] Methocarbamol (Robaxin) "is used to relieve the discomfort caused by acute (short-term), painful muscle or bone conditions."  *Methocarbamol (Oral Route)*, MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/methocarbamol-oral-route/description/drg-20071962 (accessed Sept. 28, 2020).

[8] "Ciprofloxacin is used to treat bacterial infections in many different parts of the body . . . [including] urinary tract infections."  *Ciprofloxacin (Oral Route)*, MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/ciprofloxacin-oral-route/description/drg-20072288 (accessed Sept. 28, 2020).

[9] In New York, the designation "LCSW-R" refers to a Licensed Clinical Social Worker who has fulfilled the requirements of the New York State Insurance Law for supervised experience providing psychotherapy, and who is thus reimbursable by insurance for the provision of psychotherapy services.  *See Licensed Clinical Social Worker "R" Psychotherapy Privilege*, NYSED.GOV, http://www.op.nysed.gov/prof/sw/lcswprivilege.htm# (accessed Oct. 12, 2020).

[10] The Court notes that, while some of Plaintiff's treatment records are typewritten, many are handwritten and are, at least in part, difficult to decipher or even illegible.  Overall, the Court's summary of any handwritten treatment records is based on the Court's best interpretation of their contents.

#### a.    <u>Treatment by Dr. Delaney (Primary Care Physician)</u>

The Record indicates that Plaintiff met with her primary care physician, Dr. Delaney, on January 19, 2016 – around two weeks after her visit to UCHC.  (*Id.* at 364.)  At this appointment, Dr. Delaney noted that Plaintiff's asthma appeared "stable," but that she was experiencing "typical sciatica."  (*Id.*)  Dr. Delaney prescribed Robaxin and physical therapy.  (*Id.*)  Then, on Dr. Delaney's referral, Plaintiff underwent a physical therapy evaluation with Manolis Fourtounis, P.T. ("Fourtounis"), on February 4, 2016.  (*See id.* at 212-13.)  During that evaluation, Plaintiff reported having lower back pain and difficulty standing for prolonged periods of time, carrying objects, walking more than 12 blocks, and sleeping.  (*Id.* at 212.)  Plaintiff also reported that her pain was at a nine on a 10-point scale and that she felt the most pain "[d]uring functional activities and work tasks."  (*Id.* at 213.)  Upon examination, Fourtounis recorded that Plaintiff had "increased pain; decreased [range of motion]; decrease[d] muscle strength; [an] antalgic gait pattern;[11] [a] step to pattern with stair negotiation; [and] difficulty with squatting."  (*Id.* at 212.)  Fourtounis also noted that Plaintiff had hypertonicity on palpitation in the lumbar paraspinal area, decreased pelvic rotation, and decreased arm swing. (*Id.* at 213.)  Further, Fourtounis recorded that Plaintiff had reduced muscle strength of "4/5" in both legs, "3/5" in her bilateral hip abduction and extension, and "3/5" in her abdominal muscles.

---

[11] An antalgic gait "refers to an abnormal pattern of walking secondary to pain that ultimately causes a limp, whereby the stance phase is shortened relative to the swing phase." Auerbach, Nadja; Tadi, Prasanna, *Antalgic Gait in Adults*, NATIONAL CENTER FOR BIOTECHNOLOGY INFORMATION, https://www.ncbi.nlm.nih.gov/books/NBK559243/ (accessed Sept. 28, 2020).

(*Id.*)  Fourtounis wrote that Plaintiff had a reduced range of motion in her lumbar spine,[12] and he noted that she tested positive on the straight leg raising test.[13]  (*Id.*)

Two months later, on April 5, 2016, Dr. Delaney saw Plaintiff again and noted that she reported feeling pain, particularly on her left side, which was exacerbated when she stood for prolong periods of time at her job without a break.  (*Id.* at 362.)  Upon evaluation, Dr. Delaney referred Plaintiff to a pain management specialist, and he wrote a letter (presumably to Plaintiff's employer, Kmart), stating that Plaintiff was experiencing increasingly severe back pain and that she might need to take some time off from work for the evaluation and treatment of her condition.  (*Id.* at 363.)

On May 13, 2016, a doctor at Interborough Interventional Pain Management ("IIPM")[14] completed a "Patient's Summary Plan" for Plaintiff.  (*Id.* at 361.)  In that document, the doctor noted that Plaintiff had a history of lower back pain, obesity, and asthma, along with an antalgic

---

[12] "The lumbar spine comprises the lower end of the spinal column between the last thoracic vertebra (T12) and the first sacral vertebra (S1).  The spinal cord in this region has protection from five durable and mobile vertebrae (L1-L5) that allow for the dispersion of axial forces.  The spinal cord runs through the center of the vertebral column and terminates in the conus medullaris at the level of the L1-L2 vertebrae."  Sassack, Brett, Carrier, Jonathan D., *Anatomy, Back, Lumbar Spine*, NATIONAL CENTER FOR BIOTECHNOLOGY INFORMATION, https://www.google.com/search?q=ncbi&rlz=1C1GCEB_enUS827US857&oq=ncbi&aqs=chrome..69i57l2j69i60l5.581j0j7&sourceid=chrome&ie=UTF-8 (accessed Sept. 9, 2020).

[13] "The straight leg raise test[,] also called the Lasegue test, is a fundamental neurological maneuver during the physical examination of the patient with lower back pain aimed to assess the sciatic compromise due to lumbosacral nerve root irritation."  Willhuber, Gaston O.C., Piuzzi, Nicolas S., *Straight Leg Raise Test*, NATIONAL CENTER FOR BIOTECHNOLOGY INFORMATION,https://www.ncbi.nlm.nih.gov/books/NBK539717/#:~:text=GO%2C%20Piuzzi%20NS.-,Introduction,was%20first%20described%20by%20Dr. (accessed Sept. 11, 2020).

[14] IIPM was presumably the pain management practice group to which Dr. Delaney referred Plaintiff.  The doctor's signature on the "Patient's Summary Plan" form is illegible.  (R. at 361.)

gait.  (*Id.*)  The doctor also wrote that, upon evaluation, Plaintiff had been diagnosed with myofascial pain and lumbar radiculopathy.[15]  (*Id.*)

Next, also on Dr. Delaney's referral, Plaintiff underwent an MRI of her lumbar spine on June 7, 2016.  (*Id.* at 227.)  The MRI revealed that (1) at the L3-L4 level, Plaintiff was suffering from a posterior central disc herniation with an annular tear and thecal sac deformity; (2) at the L4-L5 level, Plaintiff had a diffuse posterior bulging disc with disc space narrowing and bilateral peripheral foraminal extension abutting the L4 nerve roots and reactive endplate changes; and (3) at the L5-S1 level, Plaintiff had a bulging disc with disc space narrowing and bilateral peripheral foraminal extension abutting the L5 nerve root.  (*Id.*)  The MRI also showed that Plaintiff had uterine fibroids.  (*Id.*)

About one month later, on July 12, 2016, Dr. Delaney drafted a letter (again, presumably to Kmart) stating that he had treated Plaintiff for eight years, that she had developed persistent back pain over the prior eight to nine months, and that the recent MRI results, which were attached, revealed severe lumbar disc disease.  (*Id.* at 226.)  Dr. Delaney opined in the letter that Plaintiff would be "totally disabled for at least the next [six] months."  (*Id.*)

Dr. Delaney saw Plaintiff again on July 19, 2016, and, upon evaluation, diagnosed her with a left shoulder sprain and muscle spasm, along with lumbar disc disease.  (*Id.* at 245.)  Soon after, on July 26, 2016, Dr. Delaney drafted another letter stating that, as of two days earlier (July 24, 2016), Plaintiff was on a medical leave of absence.  (*Id.* at 244.)

---

[15] "Radiculopathy describes a range of symptoms produced by the pinching of a nerve root in the spinal column.  The pinched nerve can occur at different areas along the spine (cervical, thoracic[,] or lumbar)."  *Radiculopathy*, JOHNS HOPKINS MED., https://www.hopkinsmedicine.org/health/conditions-and-diseases/radiculopathy (accessed Oct. 13, 2020).

On September 8, 2016, Dr. Delaney completed a Mental Capacity Assessment form, expressing a number of opinions regarding Plaintiff's functional limitations, which he indicated were all "due to pain."  (*Id.* at 248-50.)  In that form, Dr. Delaney specifically opined that Plaintiff had a "slight" limitation in her ability to set realistic goals or make plans independently of others.  (*Id.* at 250.)  Next, he opined that Plaintiff had "moderate" limitations in her abilities to carry out very short and simple instructions, sustain an ordinary routine without special supervision, make simple work-related decisions, interact appropriately with the general public, ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, be aware of normal hazards and take appropriate precautions, travel in unfamiliar places or use public transportation, and set realistic goals or make plans independently of others.  (*See id.* at 248-50.)

In addition, Dr. Delaney opined that Plaintiff had "marked" limitations in her abilities to carry out detailed instructions, maintain her attention and concentration for extended periods of time, perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, work in coordination with or proximity to others, complete a normal work day without interruptions, complete a normal work week without interruptions, perform at a consistent pace with the standard number and length of rest periods, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, and respond appropriately to changes in the work setting.  (*See id.*)  Dr. Delaney also opined that Plaintiff would, on average, have at least four absences per month from work.  (*Id.* at 249.)  As an overall matter, Dr. Delaney noted that he had relied on the medical/clinical findings in the Record to support his opinions of Plaintiff's functional limitations.  (*See id.* at 248-50.)

Also on September 8, 2016, Dr. Delaney completed a separate form relating specifically to Plaintiff's physical impairments.  (*Id.* at 252-54.)  In that form, Dr. Delaney wrote that Plaintiff suffered from diffuse lumbar disc disease and that her physical exam results, as of that date, were consistent with the June 2016 MRI findings.  (*Id*. at 252.)  Dr. Delaney also recorded that Plaintiff was unable to lift, bend, or stand for any period of time greater than 10 minutes. (*Id.*)  According to Dr. Delaney, these physical limitations precluded Plaintiff from performing her job functions.  (*See id.*)

Plaintiff's next visit with Dr. Delaney was on September 20, 2016; at that appointment, Plaintiff complained of lower back pain that worsened when she stood or bent over.  (*Id.* at 356.) In his notes from this visit, Dr. Delaney recorded that Plaintiff was suffering from persistent lower back pain and spinal disc disease, that her lumbar flexion range of motion was 30 degrees (out of 90 degrees), that her deep tendon reflexes ("DTRs") were 1+,[16] and that the straight leg raising test was again positive.  (*Id.*)  Two days later, on September 22, 2016, Dr. Delaney completed a "Physical Assessment" form regarding Plaintiff's conditions, wherein he opined that Plaintiff could walk only one block without needing rest or feeling significant pain, that she could sit for only two hours and stand for only one hour during an eight-hour workday, and that she could never lift and/or carry any amount of weight during the course of a day.  (*Id.* at 256-57 (also reiterating that Plaintiff would likely be absent from work "[m]ore than four times a month").)

---

[16] DTRs "are graded on a scale of 0 to 4.  A grade of 2 indicates normal reflexes.  A grade of 3 indicates hyperreflexia [and a grade of] 4 indicates hyperreflexia with clonus. Decreased reflexes are indicated by [a grade of] 1 (hyporeflexia) or 0 (no reflex elicited)." *Neurologic Exam: Reflexes*, MICHIGAN STATE UNIVERSITY, https://learn.chm.msu.edu/neuroexam/content/reflexes/reflexes_exam_upper.html (accessed Sept. 29, 2020).

The Record indicates that Plaintiff had her next visit with Dr. Delaney on December 6, 2016 during which she reported feeling continued pain. (*Id.* at 355.)  In a note from that visit, Dr. Delaney wrote that Plaintiff could not work. (*Id.*)  Dr. Delaney saw Plaintiff again on March 28, 2017, and, at that time, Plaintiff reported that she was having trouble ambulating and performing normal activities. (*Id.* at 353.)  Upon examination, Dr. Delaney recorded that Plaintiff's pain in her back was radiating to both her left buttock and left leg. (*Id.* at 352.)  While Dr. Delaney noted that Plaintiff's asthma was stable, he nonetheless wrote that, due to Plaintiff's lower back pain, she would be unable to work for at least the next 12 months. (*Id.* at 353-54.)

According to the Record, Plaintiff's next appointment with Dr. Delaney occurred two months later, on May 16, 2017; at that session, Dr. Delaney documented that Plaintiff had a few scaly patches of psoriasis on her left elbow. (*Id.* at 350.)  One month after that, on June 15, 2017, Dr. Delaney recorded that he had seen Plaintiff and noted that she was "doing well" with respect to her asthma. (*Id.* at 349.)  Subsequently, on July 18, 2017, Plaintiff had a follow-up visit with Dr. Delaney, during which she reported that it was difficult for her to walk more than one block. (*Id.* at 345.)  On examination, Dr. Delaney recorded that, while Plaintiff had full motor strength in her upper extremities, her pain in her lower back was radiating to her left buttock and left foot, she had again tested positive in the straight leg raising test, and she was exhibiting an antalgic gait with the added use of a cane. (*Id.* at 346.)  At that time, Dr. Delaney wrote in a treatment note that Plaintiff "[m]ay benefit [from a] rolling walker with a seat" (*id.*), and, in a letter also dated July 18, 2017, he wrote that Plaintiff had been diagnosed with lumbar disc disease with related spinal radiculopathy, along with degenerative disease of the cervical spine (*id.* at 347).  In that same letter, Dr. Delaney opined that Plaintiff was "totally disabled." (*Id.*)

11

During their next visit on September 19, 2017, Dr. Delaney referred Plaintiff to

Dr. Freddo for pain management.  (*Id.* at 345.)  Less than one month later, on October 10, 2017,

Dr. Delaney wrote a letter (again, presumably to Kmart), stating that Plaintiff was suffering from

lumbar disc disease with related spinal radiculopathy, along with degenerative disease of the

cervical spine.  (*Id.* at 344.)  In that same letter, Dr. Delaney opined that those two medical

conditions had caused Plaintiff to be "totally disabled."  (*Id.*)

The Record indicates that Dr. Delaney last saw Plaintiff on November 14, 2017.  (*Id.* at

342.)  In his note from that visit, Dr. Delaney recorded that, while Plaintiff's asthma had

remained "stable," she was still being treated for lower back pain and was "not currently able to

work."  (*Id.*)

### b.      Treatment by Dr. Suman (Pain Management)

According to the notes in the Record, it appears that Plaintiff first visited Dr. Suman, a

pain management specialist, on August 18, 2016.  (*Id.* at 277-82.)  At that visit, Plaintiff reported

feeling pain that radiated forward to her left inguinal region (groin) and sometimes to her left leg

below the knee, along with occasional cramping.  (*Id.* at 278.)  Plaintiff also reported that she

was experiencing occasional numbness and weakness in her left leg, and that she sometimes had

trouble maintaining her balance.  (*Id.*)  Further, Plaintiff reportedly stated that her pain worsened

if she stayed in one position for too long and if she walked up stairs.  (*Id.*)  Plaintiff informed

Dr. Suman that she felt mild relief from heating pads and anti-inflammatory creams, and that

muscle relaxants had helped reduce the pain, but made her drowsy.  (*Id.* at 278-79.)

On examination, Dr. Suman found that Plaintiff was alert and fully oriented, as well as

cooperative.  (*Id.* at 279.)  Dr. Suman noted that Plaintiff had no pain during palpation of her

lumbar spine, but that she referred to pain during forward flexion and lateral rotation of the

spine.  (*Id.*)  Dr. Suman wrote that Plaintiff's gait was normal and that her muscle strength in her

lower extremities was 5/5 bilaterally.  (*Id.*)  Yet, at the same time, Dr. Suman noted that Plaintiff

tested positive for referred pain "during [the] left straight leg raise."  (*Id.*)  Dr. Suman diagnosed

Plaintiff with chronic lumbar radiculopathy, chronic lower back pain, and, more generally,

chronic pain.  (*Id.* at 278.)  Dr. Suman prescribed Gabapentin,[17] physical therapy, and an

epidural injection.  (*Id.* at 278, 280.)

Plaintiff saw Dr. Suman for a second time on April 4, 2017.  (*Id.* at 283-84.)  At that visit,

Plaintiff reported that her medication, Gabapentin, had provided her with "good pain relief but

no insomnia relief."  (*Id.* at 284.)  Dr. Suman then recommended that Plaintiff switch to another

pain medication, Lyrica.[18]  (*Id.*)

### c.        Treatment by Dr. Freddo (Pain Management)

Plaintiff first visited Dr. Lorenza Freddo for pain management treatment on

September 27, 2017.  (*Id.* at 384.)  At this visit, Plaintiff complained that her pain had "gotten

progressively worse, in spite of [her] medications."  (*Id.*)  Plaintiff also reported that she had

trouble doing daily chores, including carrying shopping bags.  (*Id.*)  On examination, Dr. Freddo

recorded that Plaintiff's mental status exam was normal and that she did not display any muscle

weakness (*see id.*); at the same time, Dr. Freddo found that Plaintiff had difficulty walking on

her tip toes, had exhibited "prominent diffuse spinal tenderness [and] paraspinal thoraco-lumbar

---

[17] Gabapentin (Neurontin) "is used to help control partial seizures (convulsions) in the treatment of epilepsy."  *Gabapentin (Oral Route)*, MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/gabapentin-oral-route/description/drg-20064011 (accessed Sept. 28, 2020).

[18] Lyrica (Pregabalin) "is used for postherpetic neuralgia (pain that occurs after shingles) and pain caused by nerve damage from diabetes or a spinal cord injury."  *Pregabalin (Oral Route)*, MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/pregabalin-oral-route/description/drg-20067411 (accessed Sept. 28, 2020).

spasm," and had scoliosis – as Plaintiff's left hip was lower than her right (*id.*).  Dr. Freddo

opined that Plaintiff had lumbar spondylosis,[19] and possibly thoracic spondylosis as well.  (*Id.*)

According to the notes from this visit, Dr. Freddo increased Plaintiff's dosage of Neurontin.

(*Id.*)

Plaintiff saw Dr. Freddo again on January 22, 2018 and reported that she still had "severe

back pain."  (*Id.* at 383.)  Upon examination, Dr. Freddo found that Plaintiff had diffuse spine

tenderness and paraspinal spasms, as well as increased right thoracic tenderness, and that her

hips were not aligned.  (*Id.*)  On Dr. Freddo's referral, Plaintiff had X-rays taken soon after (*id.*

at 406-09); those imaging results, dated January 25, 2018, showed, *inter alia*, that Plaintiff had a

normal alignment but "mild degenerative disc disease" in her thoracic spine (*id.* at 407).

### d. Psychosocial Assessment by Shirley Rodriguez, LCSW-R

On December 4, 2017, Plaintiff voluntarily underwent a psychosocial assessment by

Shirley Rodriguez, LCSW-R ("Rodriguez"), at St. Barnabas Hospital.  (*Id.* at 368-73.)  Plaintiff

told Rodriguez that she had previously been diagnosed with depression and anxiety, and that she

had been prescribed a medication for her anxiety, but she could not recall its name.  (*Id.* at 368.)

Rodriguez recorded that Plaintiff's electronic medical record indicated that she was previously

diagnosed with post-traumatic stress disorder ("PTSD") and Depressive Disorder NOS.  (*Id.*)

Plaintiff reported to Rodriguez that her symptoms had "gotten worse" over time; in particular,

Plaintiff stated that her "anxious symptoms [had] triggered her insomnia" – such that she was

unable to sleep for even two hours per night.  (*Id.*)  Plaintiff reportedly also stated that her

---

[19] Lumbar Spondylosis "is age-related change of the bones (vertebrae) and discs of the spine.  These changes are often called degenerative disc disease and osteoarthritis."  *Lumbar Spondylosis*, UNIVERSITY OF MICHIGAN MEDICINE, https://www.uofmhealth.org/health-library/abr8401 (accessed Sept. 29, 2020).

depression had worsened after she stopped working in July 2016, and after her mother passed

away the following month.  (*Id.*)  Plaintiff told Rodriguez that her anxiety had "gotten so bad that

she [had] begun to pick [at] her face and arms, and/or bite her nails and cuticles."  (*Id.*)  Plaintiff

reportedly stated that she was "going through many different environmental stressors," including

family issues, which "added on to her depression and anxiety."  (*Id.*)  Plaintiff also told

Rodriguez that she had a history of trauma and abuse, including being sexually molested at age

six by a babysitter.  (*Id.* at 370-71.)

        Based on this interview, Rodriguez found that, while Plaintiff was well-groomed,

cooperative, and fully oriented, she had a "depressed" mood.  (*Id.* at 371.)  Using the multiaxial

diagnostic technique,[20] Rodriguez diagnosed Plaintiff with having had a "[m]oderate episode of

recurrent major depressive disorder" on Axis I; problems with her primary support group, social

environment, occupation, housing, and other psychosocial or environmental factors on Axis IV;

and a GAF score of 50[21] on Axis V.  (*Id.* at 372.)

_____

        [20] The multiaxial system of assessment "involves an assessment on several axes, each of
which refers to a different domain of information."  *See* American Psychiatric
Association, *Diagnostic and Statistical Manual of Mental Disorders* (4th ed. rev. 2000)
("DSM-IV"), at 27.  Axis I refers to clinical disorders and other conditions that may be the focus
of clinical attention; Axis II refers to personality disorders and mental retardation; Axis III refers
to general medical conditions that may be relevant to the understanding or management of the
individual's mental disorder; Axis IV refers to psychosocial and environmental problems that
may affect the diagnosis, treatment, and prognosis of mental disorders; and Axis V refers the
individual's Global Assessment of Functioning ("GAF") score.  *Id.*  The DSM-V, however, does
not use this system.  *See* Lane, Cheryl, *DSM 5 – Fifth Edition of the Diagnostic and Statistical
Manual of Mental Disorders,* http://www.psyweb.com/content/main-pages/dsm-5-fifth-edition-
of-the-diagnostic-and-statistical-manual-of-mental-disorders/index.jsp (Dec. 1, 2012).

        [21] A GAF score represents a clinician's overall judgment of the patient's level of
psychological, social, and occupational functioning.  GAF scores range from 1 to 100, with 1
being the lowest level of functioning and 100 the highest.  *See* DSM-IV, at 34.  A GAF score of
21 to 30 indicates that "[b]ehavior is considerably influenced by delusions or hallucinations OR
serious impairment in communication or judgment (*e.g.,* sometimes incoherent, acts grossly
inappropriately, suicidal preoccupation) OR inability to function in almost all areas (*e.g.*, stays in
bed all day; no job, home, or friends)."  *Id.*  A score of 31 to 40 indicates "[s]ome impairment in

e.     **Treatment by Dr. Khan (Psychiatrist)**

Plaintiff was first evaluated by Dr. Kahn on December 20, 2017.  (*Id.* at 374-77.)  At that

session, Plaintiff reported that her symptoms of depression and anxiety had worsened over the

prior few months, and she described her mother's death in August 2016 as having been "a major

stressor."  (*Id.* at 374.)  Plaintiff also reported that she lacked concentration, was not enjoying her

usual activities, was not sleeping well, was having trouble trusting people, and was experiencing

"anxiety flares," which were accompanied by blurry vision, stuttering, palpitations, and

sweating.  (*Id.*)  Plaintiff reportedly told Dr. Khan that she sometimes did not sleep well for days

in a row, and, when that happened, she would become very talkative.  (*Id.*)  Plaintiff also

explained to Dr. Khan that, as a child, she had been emotionally abused by her mother.  (*Id.*)

Based on this interview, Dr. Khan recorded that Plaintiff had clear speech, a logical

thought process, and a cooperative attitude, but also a depressed mood.  (*Id.* at 375.)  Using the

multiaxial diagnostic technique, Dr. Khan diagnosed Plaintiff with having had a "[m]oderate

episode of recurrent major depressive disorder" on Axis I; chronic lumbar radiculopathy, chronic

lower back pain, chronic pain, and back pain on Axis III; problems with her primary support

---

reality testing or communication (*e.g.*, speech is at times illogical, obscure, or irrelevant) OR
major impairment in several areas, such as work or school, family relations, judgment, thinking
or mood."  *Id.*  A score of 41-50 indicates "[s]erious symptoms (*e.g.*, suicidal ideation, severe
obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or
school functioning (*e.g.*, no friends, unable to keep a job)."  *Id.*  A GAF score of 51-60 signifies
"[m]oderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) OR
moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with
peers or coworkers)."  *Id.*  Scores in the 60s and higher indicate symptoms that are "mild,"
"transient," "minimal," or "absent."  *Id.*  The fifth edition of *Diagnostic and Statistical Manual
of Mental Disorders* (the "DSM-V"), however, "has dropped the use of the [GAF] scale,"
*Restuccia v. Colvin,* No. 13cv3294 (RMB), 2014 WL 4739318, at *8 (S.D.N.Y. Sept. 22, 2014)
(quoting *Mainella v. Colvin,* No. 13cv2453, 2014 WL 183957, at *5 (E.D.N.Y. Jan. 14, 2014)).
In addition, the SSA has stated that a claimant's GAF score "does not have a direct correlation to
the severity requirements in [the SSA's] disorders listings."  Revised Medical Criteria for
Evaluating Mental Disorders and Traumatic Brain Injuries, 65 Fed. Reg. 50746, 50764-5 (2000).

group, social environment, education, occupation, economic status, and other psychosocial or environmental factors on Axis IV; and a GAF score of 61 on Axis V.  (*Id.* at 376.)

Dr. Khan saw Plaintiff again on January 18, 2018.  (*Id.* at 379-80.)  At that time, Plaintiff reported that she was taking Zoloft,[22] but that the medication made her feel nauseous and gave her "palpitations."  (*Id.* at 379.)  Plaintiff also stated that, while her sleep was "ok[ay]," she felt depressed most of the time and was experiencing frequent anxiety, along with an inconsistent appetite.  (*Id.*)  From this session, Dr. Khan recorded that Plaintiff's "activity" appeared impulsive, that her mood was "depressed," and that her affect was "constricted."[23]  (*Id.* at 379-80.)  Referring only to Axis I of the multiaxial system of assessment, Dr. Khan again diagnosed Plaintiff with having had a "[m]oderate episode of recurrent major depressive disorder."  (*Id.* at 380.)  Dr. Khan then switched Plaintiff's medication from Zoloft to Wellbutrin.[24]  (*Id.* at 381.)

---

[22] Zoloft (Sertralin) "is used to treat depression, obsessive-compulsive disorder (OCD), panic disorder, premenstrual dysphoric disorder (PMDD), posttraumatic stress disorder (PTSD), and social anxiety disorder (SAD).  Sertraline belongs to a group of medicines known as selective serotonin reuptake inhibitors (SSRIs).  It works by increasing the activity of a chemical called serotonin in the brain."  *Sertraline (Oral Route)*, MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/sertraline-oral-route/description/drg-20065940 (accessed Sept. 29, 2020).

[23] Constricted or restricted affect is a term used to describe "emotional expression that is reduced in range or intensity.  It is common in depression, inhibited personalities, and schizophrenia."  *Restricted affect*, AMERICAN PSYCHOLOGICAL ASSOCIATION, https://dictionary.apa.org/restricted-affect (accessed Aug. 23, 2020).

[24] Wellbutrin (Bupropion) "is used to treat depression and to prevent depression in patients with seasonal affective disorder (SAD), which is sometimes called winter depression." *Bupropion (Oral Route)*, MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/bupropion-oral-route/description/drg-20062478 (accessed Sept. 29, 2020).

**f.     Emergency Medical Treatment at St. Barnabas Hospital**

On March 1, 2018,[25] Plaintiff was treated at the St. Barnabas Hospital Emergency Room for dizziness, shaking, numbness, shortness of breath, tightness in her chest and arms, and nausea.  (*Id.* at 386.)  Plaintiff reported to the doctors at the hospital that she had been experiencing those symptoms for over two weeks, and that her pain was at an eight out of 10. (*Id.* at 386-87.)  Plaintiff also stated that she felt "weird" after taking Wellbutrin and that the medication caused insomnia and led her to have rapid thoughts.  (*Id.* at 388.)  Plaintiff told the doctors who interviewed her that her hands had been shaky at times, and, when that happened, she could not grip anything.  (*Id.* at 389.)  Upon evaluating Plaintiff, the doctors at the hospital opined that her symptoms were likely the "ill effects" of her medication.  (*Id.* at 391.)

**3.     Consultant Examiners**

In July 2016, Plaintiff was examined by two State agency consultative examiners, Dr. Cheryl Archbald (*id.* at 236-40),[26] and psychologist Fredelyn Engelberg, Ph.D. (*id.* at 230-33).

**a.     Examination by Dr. Archbald**

Plaintiff was seen on July 15, 2016 by Dr. Archbald, to whom she had been referred by the Division of Disability Determination for an internal medicine examination.  (*See id.* at 236.)

---

[25] As noted above, the Hearing was held on February 6, 2018 (R. at 27-59), but the ALJ did not issue his written decision until July 11, 2018 (*id.* at 8-26).  Although Plaintiff's visit to St. Barnabas Hospital in March 2018 took place after the Hearing, the SSA Record includes the treatment notes from that visit and the parties both cite to those notes in their memoranda.  (*See* Pl. Mem., at 9; Def. Mem., at 6.)  The Court thus assumes that those treatment records were submitted to the ALJ prior to the date of his decision.

[26] According to publicly available information outside of the Record, Dr. Archbald is a board-certified pediatrics specialist with additional training in preventative medicine.  *See Montefiore Medical Center,* https://www.montefiore.org/body_mobile.cfm?id=1743&action=detail&ref=18728 (accessed Oct. 13, 2020).

In her report, Dr. Archbald recorded that Plaintiff had reported feeling pain that radiated to her left back, shoulder, and elbow, which worsened with "increased sitting and increased standing." (*Id.* at 237.)  Plaintiff described the pain as "constant," and stated that, on some days, her pain was a 10/10 in severity, which caused her to stay in bed.  (*Id.*)  Plaintiff also reported that she occasionally experienced leg cramping; that she had suffered from asthma since childhood; and that she had experienced insomnia, depression, and anxiety for the last 10 years.  (*Id.*)  Although Dr. Archbald recorded that Plaintiff had previously "had an MRI done that showed a disc problem," Dr. Archbald's report does not indicate that she actually reviewed those imaging results.  (*Id.*)

On examination, Dr. Archbald found that Plaintiff was not in acute distress, had normal gait, and could walk on her heels and toes without difficulty.  (*Id.* at 237.)  She also found that Plaintiff's cervical spine showed full range of motion, with no scoliosis, and that her lumbar spine similarly showed full flexion and rotary movement bilaterally.  (*Id.* at 238.)  At the same time, however, Dr. Archbald found that Plaintiff could only squat three-quarters of the way down.  (*Id.* at 237.)  As to Plaintiff's neurologic status and extremity strength, Dr. Archbald recorded that, while there were no sensory deficits and Plaintiff's muscle strength was "5/5 in the upper and lower extremities," she had a decreased grip strength of "4/5" in her left hand.  (*Id.* at 238.)  Dr. Archbald also wrote that Plaintiff exhibited decreased visual acuity during the vision test.  (*Id.*)  Dr. Archbald then noted that a July 2016 X-ray of Plaintiff's lumbosacral spine – the findings from which she attached to her report – had shown "degenerative changes."  (*Id.* at 239.)  In particular, the July 2016 X-ray findings were that Plaintiff had "moderate degenerative spondylosis/degenerative disc disease (disc space narrowing, osteophyte formation, and vacuum

phenomenon) at L4-L5 and L5-S1" and "mild degenerative spondylosis . . . at L1-L2 and L2-L3," along with straightening of the spine.  (*Id.* at 239-40.)

Dr. Archbald diagnosed Plaintiff with, *inter alia*, decreased visual acuity, left shoulder pain, back pain, history of carpal tunnel syndrome and sciatica, asthma, insomnia, depression, anxiety, nearsightedness, and iron deficiency (anemia).  (*Id.* at 239.)  Dr. Archbald opined that Plaintiff's prognosis was "fair" and that she had "mild limitations" with "lifting and carrying, [along with] using her left arm."  (*Id*.)  Dr. Archbald also recommended that Plaintiff limit her activities involving fine visual acuity.  (*Id.*)

### b.        Examination by Dr. Engelberg, Ph.D.

On the same day that Plaintiff was seen by Dr. Archbald, she was also examined by the consulting psychologist, Dr. Engelberg.  (*Id.* at 230-31.)  Plaintiff reported to Dr. Engelberg that she was having difficulty falling asleep, and that she was experiencing crying spells, social withdrawal, anxiety with chest tightness, shortness of breath, sweating, and dizziness.  (*Id.* at 231.)  Plaintiff further reported that she felt overwhelmed, and Dr. Engelberg noted that Plaintiff cried when she reported that her mother was "'in a situation where she [could] pass away at any time.'"  (*Id*.)

Upon examination, Dr. Engelberg found that, while Plaintiff was fully oriented, had "intact" attention and concentration, and had coherent and goal-directed thought processes with no evidence of hallucinations or delusions, she was poorly groomed, her affect was dysphoric, and her mood was dysthymic.  (*Id.* at 231-32.)  As for Plaintiff's memory skills, Dr. Engelberg found that they were "mildly impaired," as Plaintiff was not able to repeat three out of three objects immediately and she was unable to recall any of the three objects after five minutes.  (*Id.* at 232.)  Dr. Engelberg also indicated that Plaintiff's cognitive functioning was "below average"

and that her general fund of information was "limited." (*Id.*)  Nonetheless, Dr. Engelberg noted

that Plaintiff was able to perform all activities of daily living, including dressing, showering, and

grooming herself, as well as cooking, cleaning, laundry, shopping, managing money, and taking

public transportation. (*Id.*)  Dr. Engelberg also opined that Plaintiff was able to "follow and

understand simple directions and instructions, perform simple tasks independently, and maintain

attention and concentration." (*Id.* at 233.)  Likewise, she opined that Plaintiff was "able to

maintain a regular schedule and learn new tasks," although she indicated that Plaintiff "would be

significantly impaired in [her] ability to perform complex tasks independently." (*Id.*)

Dr. Engelberg went on to opine that Plaintiff was "able to make appropriate decisions" and

"relate adequately with others," but that Plaintiff was "mildly impaired in [her] ability to

appropriately deal with stress." (*Id.*)  In her report, Dr. Engelberg diagnosed Plaintiff with

adjustment disorder with anxiety and opined that her prognosis was "fair." (*Id.*)

### 4.      State Agency Non-Examining Reviewer (Dr. Harding, Ph.D.)

On July 21, 2016, Dr. Harding, SSA's psychologist reviewer, reviewed the medical

records that had been made available as of that date, and opined in a medical evaluation form

that Plaintiff had a "mild" restriction in her activities of daily living; that she had "mild"

difficulties in maintaining social functioning and in maintaining concentration, persistence, and

pace; and that she had experienced no repeated episodes of decompensation for an extended

duration. (*Id.* at 65.)  Dr. Harding further found that Plaintiff suffered from a primary

impairment of a degenerative back disorder, along with secondary impairments of asthma and

anxiety. (*Id.*)  According to Dr. Harding, all three of these impairments, however, were

"non-severe," because they did "not significantly interfere with [Plaintiff's] ability to function on

a daily basis." (*Id.* at 64-65.)

C.      **Plaintiff's Testimony Before the ALJ**

On February 6, 2018, Plaintiff, represented by her attorney, testified at the Hearing before the ALJ.  (*Id.* at 27-59.)  When asked to describe what had happened on June 4, 2016, Plaintiff recalled that she had gone to the emergency room because she felt significant pain in her spine and left leg and that, upon examination, she had been prescribed a muscle relaxant, along with Ibuprofen. (*Id.* at 39.)  Plaintiff testified that, soon after, she saw her primary care physician, Dr. Delaney, who recommended certain pain medications along with physical therapy.  (*Id.* at 39-40.)  When asked why she was later discharged from physical therapy for non-attendance, Plaintiff explained that she had sometimes missed physical therapy appointments when the "pain was so bad" that she could not "get out of bed."  (*Id.* at 40.)

Plaintiff was then asked about her prior work at Kmart, and she explained that, starting in January 2016 (around the alleged onset date of her disability), she began to leave work early because the pain caused to her have "dizzy spells" and to experience "numbness in [her] neck." (*Id.*)  Plaintiff recalled that, from January 2016 to July 2016, she also often arrived to work late due to the pain.  (*Id.*)  As for transportation, Plaintiff testified that, starting in January 2016, her sister drove her to Kmart each day because it was "too hard for [Plaintiff] to travel by public transportation, due to the fact that the pain was so bad and [she] couldn't sit or stand and be in crowded places."  (*Id.* at 41.)

In response to her attorney's questioning, Plaintiff testified that, since July 2016, she had experienced "difficulties standing, sitting, walking, and even functioning on a regular day."  (*Id.* at 45.)  Plaintiff noted that her medication made her feel "drowsy," yet she remained unable to sleep, which caused her to feel "slightly disoriented and always feeling like [she was] half asleep."  (*Id.*)  She also testified that her medication made it "hard to concentrate at times."  (*Id.*)

She then explained that she could not "sit or stand for too long," and that she needed to take "breaks in between." (*Id.*) When asked, Plaintiff estimated that she could only sit for around 10 minutes or stand for 10 to 15 minutes before needing to switch positions. (*Id.* at 45-46.) Plaintiff also testified that, each day, she would walk three blocks with her 12-year old son to take him to his school, and, upon her return to the apartment, she felt "exhausted [and] in pain." (*Id.* at 46.) As for her ability to lift or carry items, Plaintiff stated that she intentionally had her groceries delivered so that she would not have to carry them, and that "[e]ven carrying something approximately . . . [five] pounds" required her to take a break. (*Id.* (stating that the most she carried on a walk home would be "[a] smaller container of milk, eggs, bread, [or] cereal.").)

When she was again asked about her sleep, Plaintiff testified that, because she could not "sit, stand, or do anything for a long period of time, on top of having insomnia," she struggled to find a "comfortable position to sleep" during the night. (*Id.* at 47.) She estimated that she slept for two to three hours per night. (*See id.*) She also stated that she "[f]unction[ed] during the day . . . with . . . chronic pain" and a "drowsy" feeling "from [her] medication." (*Id.* at 49.) In describing her back pain, Plaintiff testified that her spine felt like it was "being crushed." (*Id.* at 48.) She also stated that the pain would spread to her hip, thigh, and leg, and that she sometimes felt pain in her neck. (*Id.* (further stating that the pain made her feel "drowsy or dizzy").)

Regarding her ability to focus and concentrate, Plaintiff testified that she often felt "unbalanced because [she felt] drowsy and [asleep]." (*Id.* at 49.) She also testified that her disorientation made it hard for her to concentrate. (*Id.*) During the Hearing, Plaintiff estimated that she needed to lie down at least 20 times a day, for about 15 minutes at a time. (*Id.*) In

response to the ALJ's questioning, Plaintiff also stated that, since 2017, she had used a roller walker whenever she needed to travel "long distance[s]" (*i.e.*, "more than three blocks") or needed to stand in line.  (*Id.* at 53-54.)

Lastly, with respect to her depression, Plaintiff testified that the medication she took, which she identified as Zoloft,[27] made her feel "foggy" and also caused her heart to beat rapidly.  (*Id.* at 50 (additionally stating that Zoloft made her feel nauseous and "too hyper").)  Plaintiff then stated that her mother's death in August 2016 had been a "trigger" for her depression (*see id.*), and that her ongoing depression caused her to isolate herself and avoid "go[ing] to functions" (*id.* at 51 (testifying that she "regular[ly]" found herself in tears because of her mother's death)).  She testified that, due to her psychiatric medication, she lived "in a state of drowsiness, which also interfere[d] with [her ability] to comprehend the way [she] would normally . . . or [to] stay focused."  (*Id.* at 54-55.)

### D.      The Current Action and the Motions Before the Court

Represented by counsel, Plaintiff filed the Complaint in this action on April 30, 2019, challenging the decision of the Commissioner denying her SSDI benefits under Title II of the Act.  (*See* Complaint, dated April 30, 2019 ("Compl.") (Dkt. 1).)  Plaintiff maintained in her Complaint that she was entitled to SSDI benefits.  (*Id.* ¶ 4.)

---

[27] As noted above (*see* Background, *supra*, at Section B(2)(e)), the Record suggests that, in January 2018 (one month prior to the Hearing), Plaintiff's treating psychiatrist, Dr. Khan, had switched Plaintiff's prescription from Zoloft to Wellbutrin (*see* R. at 381).  In addition, the doctors' notes from Plaintiff's visit to St. Barnabas Hospital Emergency Room in March 2018 (one month after the Hearing) suggest that she was taking Wellbutrin at that time.  (*Id.* at 387-89.)  Yet, given Plaintiff's testimony during the Hearing, it is unclear whether, at least for the month of February, she had switched back to taking Zoloft, or had simply misidentified her then-current medication.

On November 29, 2019, Plaintiff filed a motion for judgment on the pleadings in her favor, seeking reversal of the Commissioner's decision, and either an award of benefits or remand for further proceedings (Dkt. 19), along with a memorandum of law in support (*see* Pl. Mem.).  On January 28, 2020, Defendant opposed Plaintiff's motion and filed a cross-motion for judgment on the pleadings in favor of the Commissioner (Dkt. 21), together with a memorandum of law (*see* Def. Mem.).  On February 17, 2020, Plaintiff filed a reply memorandum, largely reiterating her principal contentions as to why the ALJ's decision warrants reversal or, alternatively, remand for further administrative proceedings.  (*See* Reply Brief ("Pl. Reply Mem.") (Dkt. 23).)

## DISCUSSION

## I.      APPLICABLE LEGAL STANDARDS

### A.      Judgment on the Pleadings

Judgment on the pleadings under Rule 12(c) is appropriate where "the movant establishes 'that no material issue of fact remains to be resolved,'" *Guzman v. Astrue*, No. 09cv3928 (PKC), 2011 WL 666194, at *6 (S.D.N.Y. Feb. 4, 2011) (quoting *Juster Assocs. v. City of Rutland*, 901 F.2d 266, 269 (2d Cir. 1990)), and a judgment on the merits can be made "'merely by considering the contents of the pleadings,'" *id*. (quoting *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988)).

Judicial review of a decision of the Commissioner is limited.  The Commissioner's decision is final, provided that the correct legal standards are applied, and findings of fact are supported by substantial evidence.  42 U.S.C. § 405(g); *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000).  "[W]here an error of law has been made that might have affected the disposition of the case, [a] court cannot fulfill its statutory and constitutional duty to review the decision of

the administrative agency by simply deferring to the factual findings of the ALJ." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984) (citation omitted)).  Thus, the first step is to ensure that the Commissioner applied the correct legal standards.  *See Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987).

The next step is to determine whether the Commissioner's decision is supported by substantial evidence.  *See Tejada*, 167 F.3d at 773.  Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal citation and quotation marks omitted).  In making this determination, a court must consider the underlying record.  The reviewing court does not, however, decide *de novo* whether a claimant is disabled.  *See Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002) ("Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, we will not substitute our judgment for that of the Commissioner."); *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997).  Thus, if the correct legal principles have been applied, the Court must uphold the Commissioner's decision upon a finding of substantial evidence, even where contrary evidence exists.  *See Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder."); *see also DeChirico v. Callahan*, 134 F.3d 1177, 1182-83 (2d Cir. 1998) (affirming decision where substantial evidence supported both sides).

### B.    The Five-Step Sequential Evaluation

To be entitled to disability benefits under the Act, a claimant must establish his or her "inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998).  An individual is considered to be under a disability only if the individual's physical or mental impairments are of such severity that he or she is not only unable to do his or her previous work, but also cannot, considering his or her age, education, and work experience, engage in any other kind of substantial gainful work that exists in the national economy.  42 U.S.C. § 423(d)(2)(A).

In evaluating a disability claim, an ALJ must follow the five-step procedure set out in the regulations governing the administration of Social Security benefits.  *See* 20 C.F.R. § 404.1520; *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam).  Throughout the inquiry, the ALJ must consider four primary sources of evidence:  "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience."  *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (citations omitted).

The first step of the inquiry requires the ALJ to determine whether the claimant is engaged in substantial gainful activity.  20 C.F.R. § 404.1520(a)(4)(i).  If not, at the second step, the ALJ determines whether the claimant has a "severe" impairment or combination of impairments that significantly limits his or her physical or mental ability to do basic work activities.  *Id.* §§ 404.1520(a)(4)(ii), (c).  If the claimant does suffer from such an impairment, then the third step requires the ALJ to determine whether this impairment meets or equals an impairment listed 20 C.F.R. Pt. 404, Subpt. P, App'x 1 (the "Listings").  *Id.* § 404.1520(a)(4)(iii).  If it does, then the claimant is presumed to be disabled "without considering [the claimant's] age, education, and work experience."  *Id*. § 404.1520(d).

Where the claimant alleges a mental impairment, Steps Two and Three require the ALJ to apply a "special technique," outlined in 20 C.F.R. § 404.1520a, to determine the severity of the claimant's impairment at Step Two, and to determine whether the impairment satisfies Social Security regulations at Step Three.[28]  *See Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008).  If the claimant is found to have a "medically determinable mental impairment," the ALJ must "specify the symptoms, signs, and laboratory findings that substantiate the presence of the impairment(s)," then "rate the degree of functional limitation resulting from the impairment(s) in accordance with paragraph (c) of [Section 404.1520a]," which specifies four broad functional areas:  (1) activities of daily living; (2) social functioning; (3) concentration, persistence or pace; and (4) episodes of decompensation.[29]  20 C.F.R. §§ 404.1520a(b), (c)(3); *see Kohler*, 546 F.3d at 265.  The functional limitations for these first three areas are rated on a five-point scale of "[n]one, mild, moderate, marked, [or] extreme," and the limitation in the fourth area (episodes of decompensation) is rated on a four-point scale of "[n]one," "one or two," "three," or "four or more."  20 C.F.R. § 404.1520a(c)(4).

If the claimant's impairment does not meet or equal a listed impairment, then the ALJ must determine, based on all the relevant evidence in the Record, the claimant's RFC, or ability

---

[28] Pursuant to 81 Fed. Reg. 66138-01 (S.S.A. Sept. 26, 2016), the SSA revised the criteria in the Listing of Impairments (the "Listing," 20 C.F.R. Pt. 404, Subpt. P, App. 1) used to evaluate claims involving mental disorders under Titles II and XVI of the Act, effective January 17, 2017.  These revisions impacted various relevant portions of 20 C.F.R. §§ 404 and 416; *see Brothers v. Colvin*, No. 7:16cv100 (MAD), 2017 WL 530525, at *4 n.2 (N.D.N.Y. Feb. 9, 2017).

[29] "Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace."  *Morales v. Colvin*, No. 13cv4302 (SAS), 2014 WL 7336893, at *8 (S.D.N.Y. Dec. 24, 2014) (quoting *Kohler*, 546 F.3d at 266 n.5).

to perform physical and mental work activities on a sustained basis. *Id.* § 404.1545. The ALJ then proceeds to the fourth step of the inquiry, which requires the ALJ to determine whether the claimant's RFC allows the claimant to perform his or her "past relevant work." *Id.* § 404.1520(a)(4)(iv). Finally, if the claimant is unable to perform his or her past relevant work, the fifth step requires the ALJ to determine whether, in light the claimant's RFC, age, education, and work experience, the claimant is capable of performing "any other work" that exists in the national economy. *Id.* §§ 404.1520(a)(4)(v), (g).

On the first four steps of the five-step evaluation, the claimant generally bears the burden of establishing facts to support his or her claim. *See Berry*, 675 F.2d at 467 (internal citation omitted). At the fifth step, the burden shifts to the Commissioner to "show that there is work in the national economy that the claimant can do." *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009). The Commissioner must establish that the alternative work "exists in significant numbers" in the national economy and that the claimant can perform this work, given his or her RFC and vocational factors. 20 C.F.R. § 404.1560(c)(2).

Where the claimant only suffers from exertional impairments, the Commissioner can satisfy this burden by referring to the Medical-Vocational Guidelines, set out in 20 C.F.R. Pt. 404, Subpt. P, App'x 2 (commonly referred to as the "grids"). Where, however, the claimant suffers non-exertional impairments, such as visual impairment, psychiatric impairment, or pain, that "'significantly limit the range of work permitted by his [or her] exertional limitations,' the ALJ is required to consult with a vocational expert," rather than rely exclusively on these published guidelines. *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (quoting *Bapp v. Bowen*, 802 F.2d 601, 604-05 (2d Cir. 1986) (internal citations omitted)).

C.     **Duty To Develop the Record**

"Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record," *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996) (citing *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982)), and failure to develop the record may be grounds for remand, *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999); *accord Craig v. Comm'r of Soc. Sec.*, 218 F. Supp. 3d 249, 262 (S.D.N.Y. 2016) (noting that "[r]emand is appropriate where this duty is not discharged").  Indeed, "where there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history 'even when the claimant is represented by counsel.'"  *Rosa*, 168 F.3d at 79 (quoting *Perez*, 77 F.3d at 47).

The SSA regulations explain this duty to claimants this way:

> Before we make a determination that you are not disabled, we will develop your complete medical history . . . [and] will make every reasonable effort to help you get medical reports from your own medical sources when you give us permission to request the reports. . . .  'Every reasonable effort' means that we will make an initial request for evidence from your medical source and, at any time between 10 and 20 calendar days after the initial request, if the evidence has not been received, we will make one follow[-]up request to obtain the medical evidence necessary to make a determination.

20 C.F.R. §§ 404.1512(b)(1), (b)(1)(i).  "[I]f the documents received lack any necessary information, the ALJ should recontact the treating physician."  *Oliveras ex rel. Gonzalez v. Astrue*, No. 07cv2841 (RMB) (JCF), 2008 WL 2262618, at *6 (S.D.N.Y. May 30, 2008), *report and recommendation adopted*, 2008 WL 2540816 (June 25, 2008).  The ALJ also has the authority to subpoena medical evidence on behalf of the claimant, 42 U.S.C. § 405(d), but is not required to subpoena medical records if they are not received following two ordinary requests,

*Gonell De Abreu v. Colvin*, No. 16cv4892 (BMC), 2017 WL 1843103, at *5 (E.D.N.Y. May 2, 2017); 20 C.F.R. § 404.950(d)(1).

The SSA regulations further explain that a claimant's "complete medical history" means the records of his or her "medical source(s)." 20 C.F.R. § 404.1512(b)(1)(ii). If the information obtained from medical sources is insufficient to make a disability determination, or if the ALJ is unable to seek clarification from treating sources, the regulations also provide that the ALJ should ask the claimant to attend one or more consultative evaluations. *Id.* §§ 404.1512(b)(2), 404.1517. Where, however, there are no "obvious gaps" in the record and where the ALJ already "possesses a 'complete medical history,'" the ALJ is "under no obligation to seek additional information in advance of rejecting a benefits claim." *Rosa*, 168 F.3d at 79 n.5.

The question of "[w]hether the ALJ has met his duty to develop the record is a threshold question. Before reviewing whether the Commissioner's final decision is supported by substantial evidence . . . the court must first be satisfied that the ALJ provided plaintiff with a full hearing under the Secretary's regulations and also fully and completely developed the administrative record." *Craig*, 218 F. Supp. 3d at 261-62 (internal quotation marks and citations omitted); *see also* 42 U.S.C. § 405(g). Further, the court must satisfy itself that the administrative record has been adequately developed, regardless of whether the issue is raised by the plaintiff. *See Castillo v. Comm'r of Soc. Sec.*, No. 17cv09953 (JGK) (KHP), 2019 WL 642765, at *7 (S.D.N.Y. Feb. 15, 2019) (noting that, even where the plaintiff does not argue that an ALJ failed to develop the record, the court "is nevertheless obliged to conduct its own independent assessment of whether the ALJ properly discharged this duty").

### D.      The Treating Physician Rule

Under the so-called "treating physician rule,"[30] the medical opinion of a treating source

as to "the nature and severity of [a claimant's] impairments" is entitled to "controlling weight,"

where the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic

techniques and is not inconsistent with other substantial evidence in [the] case record."

20 C.F.R. § 404.1527(c)(2).  "Treating source" is defined as the claimant's "own physician,

psychologist, or other acceptable medical source who . . . has provided [the claimant] with

medical treatment or evaluation" and who has had "an ongoing treatment relationship" with him

or her.  *Id.* § 404.1502.  Treating physicians' opinions are generally accorded deference because

treating physicians "are likely to be the medical professionals most able to provide a detailed,

longitudinal picture" of a claimant's condition and "bring a unique perspective to the medical

evidence that cannot be obtained from the objective medical findings alone or from reports of

individual examinations, such as consultative examinations."  *Id.* § 404.1527(c)(2); *see Taylor v.*

*Barnhart*, 117 F. App'x 139, 140 (2d Cir. 2004) (Summary Order).

Where an ALJ determines that a treating physician's opinion is not entitled to

"controlling weight," the ALJ must "give good reasons" for the weight accorded to the opinion.

20 C.F.R. § 404.1527(c)(2).   Failure to "give good reasons" is grounds for remand.  *Halloran v.*

*Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004) ("We do not hesitate to remand when the

Commissioner has not provided 'good reasons' for the weight given to a treating physician's

opinion . . . .").  Moreover, in determining the weight to be accorded to an opinion of a treating

physician, the ALJ "must apply a series of factors," *Aronis v. Barnhart*, No. 02cv7660 (SAS),

---

[30] In accordance with Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 11 (Jan. 18, 2017), the treating physician rule, as described herein, will no longer be in effect for applications made to the SSA on or after March 27, 2017.

2003 WL 22953167, at *5 (S.D.N.Y. Dec. 15, 2003) (citing, *inter alia*, 20 C.F.R.

§ 404.1527(d)(2)[31]), including:  (1) the length of the treatment relationship and the frequency of

examination; (2) the nature and extent of the treatment relationship, including whether the

treatment received was particular to the claimant's impairment; (3) the supportability of the

physician's opinion; (4) the consistency of the physician's opinion with the record as a whole;

and (5) the specialization of the physician providing the opinion, 20 C.F.R. §§ 404.1527(c)(2)-

(5);  *see Shaw*, 221 F.3d at 134 (noting that these five factors "must be considered when the

treating  physician's opinion is not given controlling weight").

Even where a treating physician's opinion is not entitled to "controlling weight," it is

generally entitled to "more weight" than the opinions of non-treating and non-examining

sources.  20 C.F.R. § 404.1527(c)(2); *see* SSR 96-2p (S.S.A. July 2, 1996) ("In many cases, a

treating source's medical opinion will be entitled to the greatest weight and should be adopted,

even if it does not meet the test for controlling weight."); *see also Gonzalez v. Apfel*, 113 F.

Supp. 2d 580, 589 (S.D.N.Y. 2000).  A consultative physician's opinion, by contrast, is

generally  entitled to "little weight."  *Giddings v. Astrue*, 333 F. App'x 649, 652 (2d Cir. 2009)

(Summary Order) (internal quotation marks and citation omitted).  This is because consultative

examinations "are often brief, are generally performed without benefit or review of the

claimant's medical history, and, at best, only give a glimpse of the claimant on a single day."

*Simmons v. U.S. R.R. Ret. Bd.*, 982 F.2d 49, 55 (2d Cir. 1992) (internal quotation marks and

citations omitted).  The opinions of consultative physicians, though, "can constitute substantial

---

[31] On February 23, 2012, the Commissioner amended 20 C.F.R. § 404.1527, by, among
other things, removing paragraph (c), and re-designating paragraphs (d) through (f) as paragraphs
(c) through (e).

evidence in support of the ALJ's decision" when the opinion of a claimant's treating physician cannot be obtained. *Sanchez v. Commissioner of Social Sec.*, No. 15cv4914, 2016 WL 8469779, at *10 (S.D.N.Y. Aug. 2, 2016), *report and recommendation adopted*, 2017 WL 979056 (Mar. 13, 2017).

  **E.**  **Assessment of a Claimant's Subjective Complaints**

  Assessment of a claimant's subjective complaints about his or her symptoms or the effect of those symptoms on the claimant's ability to work involves a two-step process. Where a claimant complains that certain symptoms limit his or her capacity to work, the ALJ is required, first, to determine whether the claimant suffers from a "medically determinable impairment[ ] that could reasonably be expected to produce" the symptoms alleged. 20 C.F.R. § 404.1529(c)(1). Assuming the ALJ finds such an impairment, then the ALJ must take the second step of "evaluat[ing] the intensity and persistence of [the claimant's] symptoms," considering "all of the available evidence," to determine "how [the] symptoms limit [the claimant's] capacity for work." *Id.* § 404.1529(c)(1). In doing so, the ALJ must consider all of the available evidence, and must not "reject [ ] statements about the intensity and persistence" of the claimant's symptoms "solely because the available objective medical evidence does not substantiate [the claimant's] statements." *Id.* § 404.1529(c)(2). Instead, where the claimant's contentions regarding his or her symptoms are not substantiated by the objective medical evidence, the ALJ must evaluate the claimant's statements in relation to the objective evidence and other evidence, in order to determine the extent to which the claimant's symptoms affect his or her ability to do basic work activities. *Id.* § 404.1529(c)(3)-(4); *see also* SSR 16-3p.[32]

---

   [32] Effective on March 28, 2016, SSR 16-3p superseded SSR 96-7p, which had required the ALJ to make a finding on the credibility of the claimant's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms, where those statements

While an ALJ is required to take a claimant's reports of his or her limitations into account in evaluating his or her statements, an ALJ is "not required to accept the claimant's subjective complaints without question." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010). To the extent the ALJ determines that the claimant's statements are not supported by the medical record, however, the ALJ's decision must include "specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence," and the reasons must be "clearly articulated" for a subsequent reviewer to assess how the adjudicator evaluated the individual's symptoms. SSR 16-3p. The factors that an ALJ should consider in evaluating the claimant's subjective complaints, where they are not supported by objective medical evidence alone, are: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medications taken to alleviate the symptoms; (5) any treatment, other than medication, that the claimant has received for relief of the symptoms; (6) any other measures that the claimant employs to relieve the symptoms; and (7) other factors concerning the claimant's functional limitations and restrictions as a result of the symptoms. *See* 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii).

---

are not substantiated by objective medical evidence. *See* SSR 96-7p (S.S.A. July 2, 1996). The new ruling, SSR 16-3p, eliminates the use of the term "credibility" from the SSA's sub-regulatory policy, in order to "clarify that subjective symptom evaluation is not an examination of an individual's character." SSR 16-3p (S.S.A. Mar. 28, 2016). Instead, adjudicators are instructed to "consider all of the evidence in an individual's record when they evaluate the intensity and persistence of symptoms after they find that the individual has a medically determinable impairment(s) that could reasonably be expected to produce those symptoms." *Id.* Both the two-step process for evaluating an individual's symptoms and the factors used to evaluate the intensity, persistence and limiting effects of an individual's symptoms remain consistent between the two rulings. *Compare* SSR 96-7p *with* SSR 16-3p. As the ALJ's decision in this matter was issued after the new regulation went into effect, the Court will review the ALJ's evaluation of Plaintiff's statements regarding the intensity of her symptoms under the later regulation, SSR 16-3p.

II.     **THE ALJ'S DECISION**

On July 16, 2018, ALJ Kanner issued his decision, finding that Plaintiff was not disabled under the Act and thus did not qualify for SSDI benefits.  (R. at 11-21.)  In rendering his decision, the ALJ applied the five-step sequential evaluation.

A.     **Steps One Through Three of the Sequential Evaluation**

At Step One, the ALJ determined that Plaintiff had met the insured-status requirements of the Act through December 31, 2020, and that she had not engaged in substantial gainful activity since January 4, 2016, the alleged onset date of her disability.  (*Id.* at 13.)

At Step Two, the ALJ found that Plaintiff had the "severe impairments" of degenerative disc disease and depressive disorder (*see id.* at 14), and that she had the "nonsevere" impairments of asthma and vision impairment, which, according to the ALJ, were "well-controlled with treatment" (*see id.*).[33]

At Step Three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of the impairments included in the Listings at Sections 1.04 ("Disorders of the spine"), 12.04 ("Depressive, Bipolar and Related Disorders"), and 12.06 ("Anxiety and Obsessive-Compulsive Disorders").[34]  (*Id.*)  As relevant here, the ALJ determined that Plaintiff's mental impairments did not, as required, meet at least

_____

[33] From the structure of the ALJ's decision, it is unclear whether he found that all of Plaintiff's identified impairments, or only those that he characterized as "nonsevere," were "well-controlled."  (*See* R. at 14.)

[34] As noted above (*see supra*, at n.27), effective January 17, 2017, the SSA revised the criteria in the Listings for claims involving mental disorders.  Here, Plaintiff does not purport to argue that the ALJ erred in finding that Plaintiff did not meet the requirements of any Listing, and the parties do not disagree as to the ALJ's application of the revised standard.  Accordingly, the Court need not reach the question as to whether, given that Plaintiff's claim was filed prior to January 17, 2017 (that is, prior to the effective date of the revisions to Paragraph B), the ALJ should have applied the prior standard.  (*See id.*)

two of the four criteria set out in "Paragraph B" of the Listing.[35]  (*Id.*)  In particular, the ALJ

determined that Plaintiff's mental impairments resulted in only "mild" restrictions in

understanding, remembering, or applying information; a "mild" limitation in interacting with

others; a "moderate" limitation in concentrating, persisting, or maintaining pace; and no

limitation in adapting or managing herself.  (*Id.*)  The ALJ also concluded that Plaintiff's mental

impairments did not meet the requirements of "Paragraph C" of the Listing.  (*Id.* at 15.)

**B.**     **The ALJ's Assessment of Plaintiff's RFC**

The ALJ then found that Plaintiff had the RFC to "perform the full range of light work as

defined in 20 C.F.R. § 404.1567(b) except that [Plaintiff would be] limited to simple (1 and

2-step) instructions and tasks."  (*Id.*)  In making this RFC determination, the ALJ found that

---

[35] A claimant meets the listing for affective disorders (i.e., Listing 12.04) or anxiety-related disorder (i.e., Listing 12.06), where she meets both the "paragraph A" and "paragraph B" criteria, or meets the "paragraph C" criteria of those listings.

To meet the "paragraph B" criteria under either Listing, a claimant would need to demonstrate at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; and (4) repeated episodes of decompensation, each of extended duration. The definition of "marked" as it applies to measuring the degree of a limitation means "more than moderate but less than extreme." 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.00(C).

To meet the "paragraph C" criteria under Listing 12.04, a claimant would need to demonstrate (1) a medically documented history of chronic affective disorder of at least two years' duration causing more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and (2) one of the following: (a) repeated episodes of decompensation, each of extended duration; (b) a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or a change in the environment would be predicted to cause the individual to decompensate; or (3) current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.  To meet the "paragraph C" criteria under Listing 12.06, a claimant would only need to demonstrate that his or her anxiety-related disorder resulted in a complete inability to function independently outside the area of his or her home.

Plaintiff had "medically determinable impairments [that] could reasonably be expected to cause the alleged symptoms" that she had described, but that her "statements concerning the intensity, persistence[,] and limiting effects of [her] symptoms [were] not entirely consistent with the medical evidence and other evidence in the [R]ecord," and, ultimately, with the RFC assessment that the ALJ had developed based on that evidence.  (*Id.* at 16.)

In evaluating the extent of Plaintiff's physical and mental impairments, the ALJ first considered Plaintiff's subjective complaints, particularly her reports that she was unable to work due to her degenerative disc disease and her depressive disorder.  (*See id.*)  The ALJ noted that Plaintiff had testified that she needed a cane to walk, could not grocery shop without assistance, could not do her own laundry, needed a walker to ambulate more than a few blocks, was constantly fatigued, and required frequent rest.  (*See id.*)

Next, the ALJ turned to the various physical evaluations and scans that Plaintiff underwent during the relevant period.  (*See id.* at 16-17.)  Specifically, the ALJ noted that the June 2016 MRI of Plaintiff's lumbar spine had shown "an L3/4 posterior central disc herniation with annular tear and thecal sac deformity," "L4/5 and L5/S1 disc space narrowing and diffuse posterior disc bulging with bilateral peripheral extension abutting the corresponding exiting nerve roots at these levels – with no central stenosis," and "[p]artially included uterine fibroids." (*Id.* at 16.)  In addition, the ALJ wrote that Plaintiff's physical examinations from January, June, and August 2016 were "within normal limits," and that a June 2017 physical examination showed "no neurological weakness or ataxia[,] but prominent diffuse spinal tenderness and paraspinal thoraco-lumbar spasm with scoliosis, left hip lower than right."  (*Id.* at 17.)  He further stated that physical examinations in 2018 were "within normal limits," and that X-rays of Plaintiff's thoracic and cervical spines from January 2018 were "unremarkable."  (*Id.*)

The ALJ then went on to weigh the opinions of one of Plaintiff's treating physicians (Dr. Delaney), the consultant examiners (Dr. Archbald and Dr. Engelberg), and the State agency non-examining consultant (Dr. Harding). (*See id.* at 17-19.) Apart from Dr. Delaney, the ALJ did not discuss the notes or opinions of Plaintiff's other treating sources. (*See generally id.*)

The ALJ assigned "little weight" to Dr. Delaney's July 12, 2016 letter concerning Plaintiff's physical impairments because, according to the ALJ, (1) that letter contained "only a conclusory opinion" that Plaintiff was disabled, which was "a finding not permitted except to the Commissioner"; and (2) there was "insufficient evidence in the [R]ecord to support such a finding." (*Id.* at 17.) As to the latter point, the ALJ specifically wrote that, even though the letter "purport[ed] to gain support from [the June 2016] MRI" of Plaintiff's lumbar spine, that MRI (in the ALJ's view) "showed only 'mild' or 'early' degenerative disc disease." (*Id.*) Similarly, the ALJ assigned "little weight" to the opinions expressed by Dr. Delaney in his September 22, 2016 physical abilities source statement and in his October 10, 2017 letter concerning Plaintiff's physical limitations, because, according to the ALJ, Plaintiff's physical examinations "[did] not show anything approaching the severity claimed" by Dr. Delaney in those opinions, "[n]or [did] the objective testing," which the ALJ described as "either normal or mild." (*Id.*) Moreover, the ALJ afforded "little weight" to the opinions contained in Dr. Delaney's September 8, 2016 mental abilities source statement, reasoning that, although Dr. Delaney was Plaintiff's treating physician, he was not a mental health practitioner, and, according to the ALJ, Dr. Delaney's opinions regarding Plaintiff's mental limitations were "not consistent with the evidence of record." (*Id.* at 19.)

In contrast, the ALJ assigned "great weight overall" to Dr. Archbald's consultative examination report, specifically finding that "Dr. Archbald's conclusions to the effect that

[Plaintiff] would have 'mild' limitations for lifting and carrying using her left arm [were] consistent with the evidence of record."  (*Id.* at 18.)  The ALJ afforded only "little weight," however, to Dr. Archbald's opinion regarding Plaintiff's vision restriction, because, according to the ALJ, that restriction was "not consistent with the evidence of record," given that "vision problems [did] not appear in any treating source notes or reports."  (*Id.*)

The ALJ also assigned "great weight" to the entirety of the opinion provided in the report of the consultant examiner, Dr. Engelberg.  (*Id.*)  As explained by the ALJ, "Dr. Engelberg's assessment of limitations for performing complex tasks [was] consistent with the evidence of record, as [was] the remainder of [Dr. Engelberg's] medical source statement paragraph, which state[d] that but for the complex tasks[, Plaintiff had] no more than mild limitations."  (*Id.*)

Finally, the ALJ assigned "partial weight" to the opinions of the State agency medical consultant Dr. Harding regarding Plaintiff's mental impairments, as the ALJ "[r]ecogniz[ed] that Dr. Harding had not had an opportunity to evaluate [Plaintiff]."  (*Id.*)  The ALJ then explained that he chose to "defer[] to the opinion of Dr. Engelberg regarding the entirety of [Plaintiff's] mental limitations, since Dr. Engelberg actually evaluated [Plaintiff] in person."  (*Id.*)

After weighing the medical opinion evidence, the ALJ concluded that the RFC described above was appropriate and supported by objective medical evidence.  (*Id.* at 19.)

C.      **Steps Four and Five of the Sequential Evaluation**

At Step Four, the ALJ noted that "[a] finding regarding [Plaintiff's] capacity for past relevant work [was] not possible or material because there [was] insufficient information about [her] past work."  (*Id.*)  The ALJ thus "assumed that [Plaintiff was] not capable of performing any past relevant work for purposes of [the] analysis."  (*Id.*)

At Step Five, however, the ALJ found that Plaintiff was able to perform work existing in the national economy during the relevant period.  (*Id*. at 20.)  In making this determination, the ALJ considered Plaintiff's age,[36] education, ability to communicate in English, work experience, and RFC.  (*Id*.)  Although he heard no testimony from a vocational expert, the ALJ concluded that "there [were] jobs, existing in significant numbers in the national economy," which Plaintiff was able to perform, and that Plaintiff was therefore "not disabled" at any time through the date of the decision.  (*Id*.)  The ALJ used the Medical-Vocational Guidelines as a "framework" to support his decision that Plaintiff could perform work existing in the national economy and was therefore not disabled as defined under the Act.  (*See id*.)

## III.    REVIEW OF THE ALJ'S DECISION

As the ALJ used the applicable five-step evaluation in analyzing Plaintiff's claims, the initial question before the Court is whether, in evaluating Plaintiff's claims under this accepted protocol, the ALJ made any errors of law that might have affected the disposition of the claim.  If the ALJ did not commit legal error, then the Court must go on to determine whether the ALJ's determination that Plaintiff was not disabled was supported by substantial evidence.

Plaintiff essentially raises three arguments in support of her position that a reversal and remand of the ALJ's decision is required:  (1) the ALJ mischaracterized clinical evidence in the Record and, in doing so, did not afford the proper weight to Dr. Delaney's opinions in accordance with the treating physician rule; (2) the ALJ's RFC finding is not supported by substantial evidence, as the ALJ did not consider Plaintiff's non-severe impairments and the

---

[36] As set out above, Plaintiff was 47 years old at the alleged disability onset date, making her a "younger person" under 20 C.F.R. § 404.1563(c), which defines such a person as being under 50 years of age.  (*Id*.)  Under that regulation, the Commissioner considers that the ability of those who are younger than 50 years to adjust to other work is not seriously limited.  (*Id*.)

reported side effects of her medications; and (3) the ALJ legally erred in applying the Medical-Vocational Guidelines (as noted above, commonly referred to as "the grids") to find Plaintiff disabled where the Record reflected that she had multiple non-exertional limitations – including depression and a moderate limitation in concentration, persistence, and pace – that significantly diminished her ability to work.  (*See generally* Pl. Mem.)

Defendant opposes each of these arguments, contending that (1) Dr. Delaney's opinions were properly afforded little weight because they were "devoid of narrative detail" and because the Record contained "many normal or nearly normal physical examinations, which were inconsistent with [those] opinions" (Def. Mem., at 17-18); (2) the RFC was supported by substantial evidence because the non-severe impairments did not need to be incorporated and the alleged side-effects of Plaintiff's medications were not documented in the treating notes (*id.* at 21-22); and (3) the ALJ's use of the grids was proper because the Record showed that "Plaintiff was able to meet the basic mental demands of unskilled work" (*id.* at 23).

Upon review of the Record, the Court agrees with Plaintiff that the ALJ *did* make errors of law that might have affected the outcome of Plaintiff's benefits claim.  First, the Court finds that the ALJ not only mischaracterized clinical evidence in the Record, but, with respect to that evidence, he substituted his own lay opinion for that of any medical professional, and he improperly discounted the opinions of Plaintiff's treating physician based on the supposed inconsistency of those opinions with the (mischaracterized) objective evidence.  Further, to the extent the ALJ perceived the treating physician's opinions as inconsistent with the evidence upon which the doctor had relied for support, the ALJ erred by simply discounting the treater's opinions without first seeking clarification of the perceived inconsistency.

Second, the Court finds that the ALJ erred in making his RFC determination insofar as he failed to take into account Plaintiff's subjective reports of the side effects of her medications.[37]

Third, the Court concludes that, given Plaintiff's non-exertional limitations, the ALJ erred by relying solely on the grids to determine disability, without hearing testimony from a vocational expert.

These errors have effectively precluded the Court from conducting a meaningful review of the ALJ's decision, and they cannot be said to have been harmless.  Accordingly, remand is warranted for further administrative proceedings.

A.      **The ALJ's Mischaracterization of Clinical Evidence in the Record and Related Errors.**

In his decision, the ALJ wrote that the June 2016 MRI of Plaintiff's lumbar spine "showed only 'mild' or 'early degenerative disc disease.'"  (R. at 17.)  Likewise, he wrote that Plaintiff's physical examinations from January and June 2016 were "within normal limits," and that the X-rays of her thoracic spine and cervical spine from January 2018 were "unremarkable."

---

[37] The Court disagrees with Plaintiff that the ALJ erred in not including the non-severe impairments of asthma and vision impairment, along with the diagnoses of uterine fibroids and psoriasis, in his determination of the RFC.  Beyond documenting diagnoses for each of these non-severe conditions, there is virtually no evidence in the Record that these conditions caused more than a minimal effect on Plaintiff's ability to work.  For example, Dr. Delaney's treatment notes consistently tracked that Plaintiff's asthma was "stable" (R. at 342, 353-54, 364), and only Dr. Archbald, who saw Plaintiff once, recorded that Plaintiff exhibited any decreased visual acuity (*id.* at 238).  As the ALJ rightly discerned, there were no treatment records from Dr. Delaney (or any other treating source) that suggested Plaintiff's vision was impaired, or, particularly, that any such impairment impacted her functional abilities.  As substantial evidence supported the ALJ's conclusion that Plaintiff's asthma and visual acuity were not severe impairments, as well as his conclusion that the Record did not reflect functional work limitations attributable to those conditions, the ALJ did not err when he did not incorporate those non-severe impairments in his RFC determination.  *See, e.g., Cardoza v. Comm'r of Soc. Sec.*, 353 F. Supp. 3d 267, 280-81 (S.D.N.Y. Feb. 12, 2019).

(*Id.*)  Considering this evidence as a whole, the ALJ then wrote, three times, that "the objective

testing [was] either normal or mild."  (*Id.*)

As Plaintiff correctly asserts, the ALJ's conclusion that the June 2016 MRI showed only

"mild" or early-stage abnormalities was "patently incorrect."  (Pl. Reply Mem., at 1.)  The June

2016 MRI report did not state that the findings were "mild."  (R. at 227.)  In fact, nowhere in the

report were the terms "mild" or "early degenerative disease" used.  (*Id.*)  The results, as

described above and outlined again herein, revealed, *inter alia*, that (1) at the L3-L4 level,

Plaintiff was suffering from a posterior central disc herniation with an annular tear and thecal sac

deformity; (2) at the L4-L5 level, Plaintiff had a diffuse posterior bulging disc with disc space

narrowing and bilateral peripheral foraminal extension abutting the L4 nerve roots and reactive

endplate changes; and (3) at the L5-S1 level, Plaintiff had a bulging disc with disc space

narrowing and bilateral peripheral foraminal extension abutting the L5 nerve root.  (*Id*.)

Dr. Delaney, who made the referral for Plaintiff's June 2016 MRI, described the results

from that diagnostic test as indicating "severe lumbar disc disease" (*id.* at 226), and no other

medical source in the Record contradicted that assessment.  Thus, it was not only a factual

mischaracterization for the ALJ to write that the June 2016 MRI showed only "mild" or early-

stage degenerative abnormalities, but also, by then relying on that mischaracterization without

any medical opinion evidence in support, the ALJ impermissibly substituted his own lay opinion

for the opinion of a medical doctor, which was error.  *See Meadors v. Astrue*, 370 Fed. Appx.

179, 183 (2d Cir. 2010) (Summary Order) (holding that "the ALJ was not at liberty to substitute

his own lay interpretation of [an MRI] diagnostic test for the uncontradicted testimony of [the

treating physician], who [was] more qualified and better suited to opine as to the [MRI test's]

medical significance"); *see also Davis v. Commissioner of Soc. Sec.*, No. 5:16-CV-0657 (WBC),

2017 WL 2838162, at *3 (N.D.N.Y. June 30, 2017) (the ALJ made an impermissible interpretation when he concluded, without medical expert support, that the plaintiff's cervical MRI showed only "minimal abnormalities").

The ALJ committed a similar type of error when he claimed, in general, that the objective testing was "either normal or mild" (R. at 17), even though a July 2016 X-ray of Plaintiff's lumbosacral spine showed otherwise. Notably, when Dr. Archbald, the consultative examiner, wrote that the July 2016 X-ray of Plaintiff's lumbosacral spine showed "degenerative changes," she was referring to the radiological findings for that X-ray, which expressly indicated, *inter alia*, that Plaintiff suffered from "*moderate* degenerative spondylosis/degenerative disc disease (disc space narrowing, osteophyte formation, and vacuum phenomenon) at L4-L5 and L5-S1." (R. at 239-40 (emphasis added).) While the ALJ pointed to the "unremarkable" results from the X-rays of Plaintiff's thoracic and cervical spines (*id.* at 17), he nowhere addressed the July 2016 X-ray of her lumbar spine, which – even according to the consultant to whose opinion on Plaintiff's physical condition the ALJ had supposedly afforded "great weight" – was *not* normal or unremarkable, and which evidenced more than only "mild" abnormalities. (*Id.* at 240.) The ALJ's cherry-picking of the X-ray results and his blanket assertion that such evidence, overall, reflected either "normal or mild" physical findings was again error. *See Meadors*, 370 Fed. Appx. at 183.

The ALJ's mischaracterizations of the clinical evidence in the Record played directly into how he then weighed the opinion of Dr. Delaney, Plaintiff's treating physician. As stated in the decision, the ALJ afforded "little weight" to Dr. Delaney's July 12, 2016 letter concerning Plaintiff's physical impairments for the very reason that, according to the ALJ, the June 2016 MRI results, which were attached to that letter, supposedly "showed only 'mild' or 'early'

degenerative disc disease.'"  (*Id.* at 17.)  In the same vein, the ALJ discounted Dr. Delaney's opinions in his September 22, 2016 physical abilities source statement and October 10, 2017 letter because those opinions, in the ALJ's view, were "not consistent" with the "objective testing."  (*Id.*)

As previously explained (*see* Discussion, *supra*, at Section I(D)), an ALJ is required to give controlling weight to a treating physician's opinion, or else give "good reasons" for the weight that is given, 20 C.F.R. § 404.1527(c)(2); *see Ross v. Colvin*, No. 6:16-CV-06618 (MAT), 2018 WL 947267, at *5 (W.D.N.Y. Feb. 20, 2018) ("A corollary to the treating physician rule is the so-called 'good reasons rule,' which provides that the SSA 'will give good reasons in [its] notice of determination or decision for the weight [it] gives [claimant's] treating source's opinion.").  Here, the ALJ's reliance on his own interpretation of the medical evidence as the basis for discounting Dr. Delaney's opinions did not constitute a "good reason" as required by the regulations.  *See, e.g., Quinto v. Berryhill*, No. 3:17-cv-00024 (JCH), 2017 WL 6017931, at *14 (D. Conn. Dec. 1, 2017) ("Because the ALJ's reasons resulted from cherry picking and from substituting his own lay opinion for that of the medical source, the ALJ ha[d] failed to state good reasons for discounting [the treating physician's] opinion."); *Ellis v. Berryhill*, No. 16-CV-6317-FPG, 2017 WL 2531716, at *3-4 (W.D.N.Y. June 12, 2017) (rejecting the ALJ's "good reason" for discrediting the treating source opinion where the ALJ "improperly used his lay opinion to interpret complex medical data").

To be sure, where the evidence of record includes medical source opinions that are inconsistent with other evidence or are internally inconsistent, the ALJ must weigh all the evidence and make a disability determination based on the totality of that evidence.  *Barringer v. Comm'r of Soc. Sec.*, 358 F. Supp. 2d 67, 80 (N.D.N.Y. 2005).  The ALJ, however, is not a

medical doctor and, as such, cannot independently interpret raw medical data as the basis to afford the treating physician's opinion less than controlling weight, which is what happened here. *See Amarante v. Comm'r of Soc. Sec.*, No. 16cv00717 (RJS) (BCM), 2017 WL 4326014, at *10-11 (S.D.N.Y. Sept. 8, 2017), *report and recommendation adopted*, 2017 WL 4326525 (S.D.N.Y. Sept. 26, 2017).

The ALJ's actions described above were also improper because, if the ALJ actually perceived Dr. Delaney's opinions to have been inconsistent with the medical evidence on which the doctor had seemingly relied, then the ALJ should have sought clarification of the perceived inconsistencies prior to discounting the treater's opinions. Dr. Delaney attached a copy of Plaintiff's June 2016 MRI results to his July 12, 2016 letter, as support for his opinions that Plaintiff suffered from "severe lumbar disc disease" and would be "totally disabled for at least the next [six] months." (R. at 226.) Similarly, Dr. Delaney noted in his September 22, 2016 physical assessment statement that his opinion that Plaintiff would miss at least four days of work per month was "based upon objective, medical, clinical, and laboratory findings" in the Record. (*Id.* at 257.) This all suggests that Dr. Delaney, a treating physician, understood the objective medical evidence to be consistent with his conclusion that Plaintiff suffered from disabling pain. Although the ALJ took issue with Dr. Delaney's opinions, and wrote that the medical evidence did not show "anything approaching the severity" of the limitations Dr. Delaney identified (*id.* at 17), the ALJ did not re-contact Dr. Delaney for an explanation or clarification of his opinions. Instead, the ALJ went on to credit the findings of Dr. Archbald over Dr. Delaney's views, even though Dr. Archbald had performed only one consultative examination. *See Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990) (cautioning that ALJs should not rely heavily on the findings of consultative physicians after a single examination).

As stated above, the ALJ has an "affirmative duty to develop the record and seek additional information from the treating physician, *sua sponte*, even if plaintiff is represented by counsel" to clarify the bases for the physician's opinions in the face of a seeming lack of support. *See Rosa*, 168 F.3d at 79; *see also* 20 C.F.R. § 404.1212(e)(1) ("We will seek additional evidence or clarification from your medical source when the report from your medical source . . . does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques."). Failure to re-contact a treating physician can constitute error and serve as grounds for remand. *See Taylor v. Astrue*, No. CV–07–3469, 2008 WL 2437770, at *3 (E.D.N.Y. June 17, 2008) (finding that it was error for the ALJ to not re-contact Plaintiff's treating physician when he determined that the physician's opinion was "not well-supported by objective medical evidence"). By not making any effort to reconcile what he saw as inconsistencies in Dr. Delaney's opinions with the objective evidence in the Record, the ALJ committed error here.

In sum, the ALJ disregarded the findings actually contained in the objective medical evidence – particularly the June 2016 MRI and July 2016 X-ray of Plaintiff's lumbar spine – and instead relied on his own lay opinion to conclude that Plaintiff's lumbar spine impairment (*i.e.,* degenerative disc disease) and related functional limitations were no worse than "mild." Then, the ALJ relied on his own characterization of the medical evidence to discount the opinions of Plaintiff's treating physician, Dr. Delaney, as insufficiently supported. Moreover, the ALJ substituted his lay opinion for that of the treating physician without first re-contacting the treater for clarification of any perceived inconsistencies between the doctor's opinions and the underlying clinical record. In combination, these errors warrant remand, as, even if the ALJ had given Dr. Delaney's opinion only somewhat more weight, it is certainly possible that the opinion evidence, overall, would have weighed in favor of a finding of disability.

Upon remand, the ALJ is directed to reassess any objective medical evidence that he

mischaracterized as "normal or mild" (particularly the June 2016 MRI and the July 2016 X-ray

of Plaintiff's lumbar spine) and to reconsider the weight to be assigned to Dr. Delaney's opinions

in light of that reassessment – after seeking clarification from Dr. Delaney, if necessary, to

reconcile any actual inconsistencies between his stated opinions and the clinical record.

### B.   In Formulating the RFC, the ALJ Failed To Account For the Reported Side Effects of Plaintiff's Medications.

As set out above, an ALJ "is required to take [a] claimant's reports of pain and other

limitations into account" in assessing the claimant's RFC.  *Genier*, 606 F.3d at 49.  If the ALJ

determines that the claimant's statements of limitation are not supported by the medical record,

then the ALJ's decision must also include "specific reasons for the weight given to the

individual's symptoms[ ] [and] be consistent with and supported by the evidence," and those

reasons must be "clearly articulated," so that a subsequent reviewer may assess how the ALJ

evaluated the individual's symptoms.  SSR 16-3p.  Factors that are relevant to a claimant's

subjective complaints of limitations include "the type, dosage, effectiveness, and side effects of

any medication taken to alleviate pain and other symptoms."  *Correale-Englehart*, 687 F. Supp.

2d at 435; *see* 20 C.F.R. § 404.1529(c)(3).

An ALJ's failure to consider a claimant's subjective reports of her symptoms, including

the side effects she experiences as a result of her medications, is grounds for remand.  *See, e.g.,*

*Vinson v. Colvin*, No. 6:15-CV-06006 (MAT), 2015 WL 8482783, at *5 (W.D.N.Y. Dec. 9,

2015) (ALJ erred when he "failed to include in his RFC the side-effects of th[e] medications to

which Plaintiff testified, chiefly, her drowsiness and tiredness, lack of ability to pay attention and

concentration, difficulty remembering and increased forgetfulness"); *Caternolo v. Astrue*, No.

6:11-CV-6601 (MAT), 2013 WL 1819264, at *13 (W.D.N.Y. Apr. 29, 2013) (ALJ erred when

he "failed to consider the side effects of Plaintiff's various medications in determining her RFC").

Here, Plaintiff testified at the Hearing about her potentially disabling symptoms, including that her medications consistently made her feel drowsy (yet unable to sleep for more than two to three hours per night), disoriented, and unable to focus and concentrate.  (R. at 49, 50, 54-55.)  These subjective complaints (as related to Plaintiff's medications) were supported by at least some objective evidence in the Record.  First, the Record contains confirmation that, a month before the Hearing, Plaintiff was prescribed Wellbutrin, which could reasonably have been expected to produce her reported symptoms, as this medication, according to information published by its manufacturers, has the known side effects of causing anxiety, irregular heartbeats, shaking, trouble sleeping, confusion, and trouble concentrating, *see Safety Profile, Wellbutrin XL,* https://www.wellbutrinxl.com/safety (accessed Oct. 16, 2020) (listing the most common side effects as, *inter alia*, nausea, insomnia, dizziness, agitation, anxiety, and palpitations);[38] *Caternolo*, 2013 WL 1819264, at *13 (relying on manufacturers' instructions to identify the known side effects for prescribed medications).  Indeed, the doctors' notes from Plaintiff's March 2018 visit to St. Barnabas Hospital Emergency Room recorded that, while she was taking Wellbutrin, Plaintiff had felt, *inter alia*, dizziness, insomnia, rapid thoughts, shakiness, and nausea.  (*Id.* at 386-88.)   The doctors who evaluated Plaintiff even explicitly linked her symptoms to the "ill effects" of her Wellbutrin prescription.  (*Id.* at 391.)  Second, the records of Dr. Khan, Plaintiff's treating psychiatrist, indicate that Plaintiff had reported side effects from her earlier psychiatric medication, Zoloft (*see id*. at 379 (noting side effects of

---

[38] *See also Bupropion (Oral Route) Side Effects*, MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/bupropion-oral-route/side-effects/drg-20062478 (accessed on October 6, 2020).

nausea and palpitations); *see also id*. at 374 (noting that Plaintiff had reported, *inter alia*, difficulty in concentrating and difficulty sleeping)), and, third, the records of Dr. Suman, who treated Plaintiff for pain management, indicate that Plaintiff had complained that the muscle relaxants she had been prescribed made her drowsy (*see id*. at 278-79). Taken together, this medical evidence provided at least some direct support for the conclusion that Plaintiff's reported symptoms of insomnia and lack of concentration were caused by her medication.

The ALJ nowhere acknowledged Plaintiff's reported symptoms related to the side effects of her medications, despite their being supported by various portions of the medical record. By not addressing, or even so much as acknowledging these symptoms, the ALJ did not satisfy his obligation to take Plaintiff's subjective complaints into account, let alone the requirement that he "clearly articulate" the reasons for discounting these complaints.

Thus, on this additional basis, the ALJ's decision must be reversed and remanded. Upon remand, the ALJ is directed to reassess Plaintiff's RFC, taking into account Plaintiff's subjective complaints regarding her symptoms, particularly her complaints of drowsiness and lack of concentration as side effects of her medication. In addressing these complaints, the ALJ should apply the multi-factor test described above (*see* Discussion, *supra*, at Section I(E)), and, to the extent the ALJ still finds Plaintiff's subjective complaints – including her complaints regarding the side effects of her medications – to be inconsistent with the developed Record, to set forth the reasons for his findings.

C.       **The ALJ's Use of the Medical Vocational Guidelines,**
         **in Lieu of Hearing Testimony from a Vocational Expert.**

Lastly, under the procedure set out in the Commissioner's regulations, once it has been determined that a claimant does not have, or cannot perform, his or her past relevant employment, the burden shifts to the Commissioner to demonstrate whether the claimant is

capable of performing any other work. *See* 20 C.F.R. § 404.1520; *see also Mimms v. Heckler*, 750 F.2d 180, 185 (2d Cir. 1984) ("once the claimant has established a prima facie case [of disability] by proving that his impairment prevents his return to his prior employment, it then becomes incumbent upon the Secretary to show that there exists alternative substantial gainful work in the national economy which the claimant could perform, considering his physical capability, age, education, experience and training" (citing *Parker*, 626 F.2d at 231)).

As noted above, the Commissioner may, under appropriate circumstances, rely on the grids (*i.e.*, the Medical-Vocational Guidelines contained in 20 C.F.R. Part 404, Subpart P, Appendix 2) to meet this burden of proof at Step Five. *See Zorilla v. Chater*, 915 F. Supp. 662, 667 (S.D.N.Y. 1996). The grids "take[] into account the claimant's residual functional capacity in conjunction with the claimant's age, education and work experience. Based on these factors, the [grids] indicate[] whether the claimant can engage in any other substantial gainful work which exists in the national economy." *Id.* As a general matter, the result listed in the grids is "dispositive on the issue of disability." *Id.* (citation omitted).

The grids, however, which account for the claimant's "exertional" capacity (to perform either heavy, medium, light or sedentary work), are not designed to take into account significant "non-exertional" impairments. *See Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986). Non-exertional impairments are those that "affect [the] plaintiff's ability to perform any activity, strength-related or not. They do not manifest themselves only when the plaintiff exerts h[er]self physically, but are present at all times." *Graham v. Heckler*, 580 F. Supp. 1238, 1241 (S.D.N.Y. 1984) (citation omitted). Non-exertional limitations may include pain, *see* 20 C.F.R. § 404.1569a(c)(1); *see also Rosa*, 168 F.3d at 78 n.2 ("A nonexertional limitation is one imposed by the claimant's impairments that affect her ability to meet the requirements of jobs other than

strength demands, and includes manipulative impairments and pain."); *Casselbury v. Colvin*,
90 F. Supp. 3d 81, 96-97 (W.D.N.Y. 2015) ("[P]ain is [] a nonexertional impairment." (citing
*Rosa*)), as well as conditions such as nervousness, anxiety, and depression, *see* 20 C.F.R.
§ 404.1569a(c)(1)(i), and difficulties in "maintaining attention or concentrating," in "tolerat[ing]
dust or fumes," and in "performing the manipulative or postural functions of some work," *id.*
§§ 404.1569a(c)(1)(ii), (v), (vii).

The Second Circuit has held that, "if a claimant's non-exertional impairments
'significantly limit the range of work permitted by h[er] exertional limitations' then the grids
obviously will not accurately determine disability status because they fail to take into account
claimant's non-exertional impairments," and "application of the grids is inappropriate." *Bapp*,
802 F.2d at 605 ("in a case where both exertional and non-exertional limitations are present, the
guidelines cannot provide the exclusive framework for making a disability determination"
(citation omitted)); *accord Rosa*, 168 F.3d at 81 ("where significant non-exertional impairments
are present at the fifth step in the disability analysis . . . application of the grids is inappropriate"
(internal citation and quotations omitted)).  The phrase "significantly limit" means "the
additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a
claimant's possible range of work as to deprive him [or her] of a meaningful employment
opportunity." *Bapp*, 802 F.2d at 606.

Where the claimant's ability to work is "significantly diminished" by non-exertional
impairments, "the Commissioner must present the testimony of a vocational expert regarding the
existence of jobs in the national economy for a person with the plaintiff's limitations."
*Rodriguez v. Apfel*, No. 96cv8330, 1998 WL 150981, at *10 (S.D.N.Y. Mar. 31, 1998) (citing
*Pratts*, 94 F.3d at 39); *see also Gallivan v. Apfel*, 88 F. Supp. 2d 92, 99 (W.D.N.Y. 2000).

The ALJ in this case relied exclusively upon the grids to determine that Plaintiff could perform jobs that existed in significant numbers in the national economy.  (R. at 20.)  The ALJ had already determined that Plaintiff had non-exertional limitations – specifically, that Plaintiff suffered from the severe impairment of depressive disorder, could perform only simple tasks, and had moderate limitations in her concentration, persistence, and pace.  (*Id.* at 14-15 (also noting that Plaintiff had mild limitations in understanding, remembering, or applying information; and in interacting with others).)  Although the ALJ wrote that Plaintiff should be limited to "simple (1 and 2 step) instructions and tasks," he did not explain at Step Five why Plaintiff's depression, or her additional mental limitations, had little or no effect on the range of work that was open to her.  (*See id.* at 20.)

In relying on the grids, rather than the testimony of a vocational expert, the ALJ was obligated to explain his finding that Plaintiff's non-exertional limitations had only a negligible impact on the range of work permitted by her exertional limitations.  *See, e.g., Hernandez v. Colvin*, No. 13cv3035, 2014 WL 388415 at *15 (S.D.N.Y. Aug. 7, 2014) ("Although an ALJ has discretion to conclude that the grid[s] adequately addresses a plaintiff's non-exertional impairments, courts in this Circuit have held that the ALJ is obligated to explain such a finding.").  Moreover, courts in this district have found it to be reversible error for ALJs to rely solely on the grids when a plaintiff has moderate psychiatric limitations resulting in non-exertional limitations.  *See, e.g., Correale–Englehart v. Astrue*, 687 F. Supp. 2d 396, 442 (S.D.N.Y. 2010) ("[P]laintiff's mental health symptoms – including the noted impact of pain on her psychological status – potentially constituted non-exertional limitations on her ability to work.  Without an explanation by the ALJ of why her mental health problems did not constitute non-exertional limitations, he was obligated to conduct a non-grid assessment of her work

capability under step five.  It was therefore improper for the ALJ to rely solely on the grids as the exclusive determinant of disability status."); *Baldwin v. Astrue*, No. 07cv6958, 2009 WL 4931363 at *28 (S.D.N.Y. Dec. 21, 2009) ("[W]e consider the ALJ's conclusion that the plaintiff's non-exertional limitations did not significantly impact his employment prospects to be erroneous.").

In this case, the ALJ's failure to explain why Plaintiff's non-exertional limitations had only a negligible impact on the range of work available to her provides another reason why remand is appropriate.  Upon remand, the ALJ is directed to re-evaluate whether the Commissioner has demonstrated that Plaintiff's ability to perform the full range of light work (with the limitation that it be limited to "simple (1 and 2-step) instructions and tasks") was not significantly diminished by her non-exertional limitations.  If the ALJ finds Plaintiff's ability to perform such work to be significantly diminished by mental impairments such as depression or an inability to concentrate, or other non-exertional impairments such as drowsiness or pain, then the Commissioner should offer testimony from a vocational expert, so as to enable the ALJ to determine whether jobs exist in the national economy for an individual with Plaintiff's particular combination of exertional and non-exertional limitations.

## CONCLUSION

For all of the foregoing reasons, Plaintiff's motion for judgment on the pleadings (Dkt. 19) is granted to the extent it seeks remand for administrative proceedings, and Defendant's cross-motion for judgment on the pleadings (Dkt. 21) is denied.

This case is hereby remanded for further proceedings, pursuant to sentence four of

42 U.S.C. § 405(g).  Upon remand, the ALJ is directed:

(1)    to reassess any objective medical that the ALJ mischaracterized in his decision as "normal or mild" (particularly the June 2016 MRI and the July 2016 X-ray of Plaintiff's lumbar spine) and to reconsider the weight to be assigned to the medical opinions of Plaintiff's treating physician, Dr. Delaney, in light of that reassessment – after seeking clarification from Dr. Delaney, if necessary, regarding any inconsistencies that the ALJ may still find between Dr. Delaney's stated opinions and the medical evidence upon which Dr. Delaney relied to support his opinions;

(2)    to state good reasons for any decision to assign less than controlling weight to Dr. Delaney's medical opinions, and to reweigh the opinion evidence overall, in light of any new weight assigned to Dr. Delaney's opinions;

(3)    to re-evaluate Plaintiff's subjective complaints regarding her symptoms, in light of the complete medical record and in accordance with the factors set out in 20 C.F.R. § 404.1529(c)(3)(i)-(vii), with particular focus on Plaintiff's complaints of drowsiness and lack of concentration as potential side effects of her medication, and to set out his reasoning as to the extent of any functional limitations resulting from such symptoms; and

(6)    to reconsider Plaintiff's RFC, consistent with all of the above, and to re-evaluate whether the Commissioner has met his burden of demonstrating that Plaintiff's RFC during the relevant period was not significantly diminished by her non-exertional limitations.  If the ALJ finds that Plaintiff's functional abilities have been significantly diminished, then, upon remand, the Commissioner should present the testimony of a vocational expert concerning the existence of jobs in the national economy for an individual with Plaintiff's combination of exertional and non-exertional limitations.

In light of this Order, the Clerk of Court is directed to close Dkts. 19 and 21 on the

Docket of this action, and to enter judgment in Plaintiff's favor, directing remand.

Dated:  New York, New York
        October 16, 2020

                              SO ORDERED

                              _____
                              DEBRA FREEMAN
                              United States Magistrate Judge

Copies to:

All counsel (via ECF)